# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| J. ROBERT SMITH, Individually, and On Behalf of All Others Similarly Situated, ) | No. 3:12-cv-00281-TSB |
| Plaintiff, ) | <u>CLASS ACTION</u> |
| vs. ) | Judge Black |
| PETER C. WALLACE, THOMAS P. LOFTIS, RICHARD J. GIROMINI, STEPHEN F. KIRK, ANDREW G. LAMPEREUR, DALE L. MEDFORD, ALBERT J. NEUPAVER, NATIONAL OILWELL VARCO, INC. and RAVEN PROCESS CORP., ) | |
| Defendants, ) | |
| – and – ) | |
| ROBBINS & MYERS, INC., an Ohio Corporation, ) | |
| Nominal Party. ) | |

---

## VERIFIED SECOND AMENDED DERIVATIVE AND CLASS ACTION COMPLAINT

MEYER WILSON CO., LPA
MATTHEW R. WILSON
BRIDGET M. WASSON
1320 Dublin Road, Suite 100
Columbus, OH 43215
Telephone: 614/224-6000
614/224-6066 (fax)

RYAN & MANISKAS, LLP
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: 484/588-5516
484/450-2582 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
CULLIN A. O'BRIEN
120 East Palmetto Park Rd., Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
  – and –
DARREN J. ROBBINS
RANDALL J. BARON
TRAVIS E. DOWNS III
DAVID T. WISSBROECKER
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Plaintiff, by his attorneys, alleges as follows:

1.      This is a class and derivative action brought by plaintiff: (i) alleging breach of fiduciary duty claims against the Board of Directors ("Board") of Robbins & Myers, Inc. ("R&M" or the "Company") in connection with the Board's efforts to sell the Company to National OilWell Varco, Inc. ("NOVI") (the "Merger"); and (ii) alleging violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 14a-9 promulgated thereunder ("Rule 14a-9") in connection with the Preliminary Proxy Statement filed by R&M with the Securities and Exchange Commission on August 31, 2012 (the "Proxy").

2.      On August 9, 2012, R&M announced that it had entered into an agreement with NOVI (the "Merger Agreement") under which NOVI's wholly owned subsidiary Raven Process Corp. ("Merger Sub") will be merged with and into the Company, with the Company surviving the Merger as a wholly owned subsidiary of NOVI.  At the effective time of the Merger, each share of Company common stock issued and outstanding will be automatically cancelled and converted into the right to receive $60.00 in cash (the "Merger Consideration").  The Merger values Robbins & Myers at approximately $2.5 billion.

3.      The Merger is the product of a fundamentally flawed process that is designed to ensure the acquisition of R&M by NOVI on terms preferential to NOVI and R&M's Board members, but detrimental to plaintiff and the other public stockholders of R&M.  For example, R&M's directors and executive team will secure over $28.6 million in the monetization of vested and unvested equity holdings and golden parachute compensation only if the Merger is consummated.

4.      In order to secure payment of these awards, which are only available to defendants if the Company is involved in a change-of-control transaction, the Board directed the Company to abandon several lucrative stand-alone options, including a share repurchase and an acquisition

- 1 -

strategy that would have increased the Company's long-term value and provided more consideration to R&M shareholders than is being paid by NOVI in connection with the Merger.

5.       Because of the Board's decision to enter into the Merger, the benefits of the Company's long-term prospects will now flow to NOVI and not the Company's shareholders. Combining these two companies will consolidate NOVI's position as a supplier of blowout preventers, which can shut off wells in an emergency. R&M is already the fourth-largest maker of blowout preventers for drilling rigs on land, and NOVI is the second largest. Together, they will be one of the largest suppliers, if not the largest supplier, of blowout preventers. Indeed, the Merger consideration significantly undervalues the long-term value of the Company and its performance and is merely an attempt by NOVI to acquire R&M at a discount.

6.       In further breach of their fiduciary duties, defendants agreed to lock up the transaction with preclusive deal protection measures that thwart the prospect of a topping bidder and prevent R&M shareholders from being able to maximize their equity stake in the Company. These deal protection devices include: (i) a no-shop clause that precludes the Board from providing confidential Company information to or even communicating with potential competing bidders except under extremely limited circumstances; (ii) a matching rights provision that requires the Board to permit NOVI three business days to match (but not top) any superior proposal that emerges; and (iii) a termination fee provision that requires an alternate buyer of R&M to pay $75 million to NOVI in the event the Merger Agreement is terminated in favor of a superior proposal.

7.       On August 31, 2012, defendants filed the Proxy that omitted or misrepresented material information regarding the Merger in violation of §§14(a) and 20(a) of the 1934 Act and in contravention of the Individual Defendants' fiduciary duties under state law. The Proxy failed to disclose material information regarding: (i) the sales process for the Company; (ii) strategic

- 2 -

alternatives for the Company; (iii) the Company's financial projections; and (vi) the financial analyses conducted by Citigroup Global Markets, Inc. ("Citi"), the Company's financial advisor.

8.      Without this material information, the Company's public shareholders will be precluded from casting a fully informed vote in connection with the Merger.  As further disclosed in the flawed Proxy, defendants are "working toward completing the merger as soon as possible" with a target date of consummating the unfair Merger by "the end of calendar year 2012."  On October 25, 2012, the Company confirmed that defendants are continuing to target a fourth quarter 2012 closing of the unfair Merger.  This action seeks equitable relief only.

### JURISDICTION AND VENUE

9.      This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act because the claims asserted herein arise under §§14(a) and 20(a) of the 1934 Act and Rule 14a-9.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      This Court has jurisdiction over defendants because R&M is incorporated in Ohio and each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper under 28 U.S.C. §1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

### PARTIES

12.      Plaintiff J. Robert Smith is, and at all times relevant hereto was, a shareholder of R&M.  Plaintiff Smith is a citizen of the State of Arizona.

- 3 -

784679_1

13.     Nominal party R&M is an Ohio corporation with its principal place of business located at 10586 Highway 75 N Willis, Texas 77378.  R&M's stock is traded on the NYSE under the ticker "RBN."  According to R&M's quarterly report filed on June 26, 2012, as of May 31, 2012, there were over 40 million shares outstanding.  R&M is a citizen of the States of Ohio and Texas.

14.     Defendant Peter C. Wallace ("Wallace") has served on the Board at all relevant times and is currently the President and Chief Executive Officer ("CEO") of R&M.  Wallace also serves as a director at Applied Industrial Technologies, Inc.  Wallace is a citizen of the State of Florida.

15.     Defendant Thomas P. Loftis ("Loftis") has served on the Board at all relevant times and is currently the Chairman of the Board.  Loftis is the President of Midland Properties.  Loftis is a citizen of the State of Ohio.

16.     Defendant Richard J. Giromini ("Giromini") has served on the Board at all relevant times and is also a member of the Audit Committee and the Nominating & Governance Committee. Giromini is the President & Chief Executive Officer of Wabash National Corporation.  Giromini is a citizen of the State of Indiana.

17.     Defendant Stephen F. Kirk ("Kirk") has served on the Board at all relevant times and is also a member of the Compensation Committee and the Nominating & Governance Committee. Kirk is the Senior Vice President & Chief Operating Officer of The Lubrizol Corporation.  Kirk is a citizen of the State of Ohio.

18.     Defendant Andrew G. Lampereur ("Lampereur") has served on the Board at all relevant times and is also a member of the Audit Committee and the Nominating & Governance Committee.  Lampereur is the Executive Vice President & Chief Financial Officer of Actuant Corporation.  Lampereur is a citizen of the State of Wisconsin.

19.     Defendant Dale L. Medford ("Medford") has served on the Board at all relevant times and is also a member of the Audit Committee and the Nominating & Governance Committee.

- 4 -

Previously, Medford was the Executive Vice President & Chief Financial Officer of Reynolds & Reynolds Company. Medford is a citizen of the State of Florida.

20. Defendant Albert J. Neupaver ("Neupaver") has served on the Board at all relevant times and is also a member of the Audit Committee and the Nominating & Governance Committee. Neupaver is the President & Chief Executive Officer of Wabtec Corporation and also serves as a director at Koppers, Inc. Neupaver is a citizen of the State of Pennsylvania.

21. The defendants named above in ¶¶14-20 are sometimes collectively referred to herein as the "Individual Defendants."

22. Defendant NOVI is a Delaware corporation with its principal place of business located at 7909 Parkwood Circle Drive, Houston, Texas 77036. NOVI's stock is traded on the NYSE under the ticker "NOV." NOVI is the largest U.S. maker of oilfield equipment in the United States. NOVI is a citizen of the States of Delaware and Texas.

23. Defendant "Merger Sub" is an Ohio Corporation, a vehicle through which defendants seek to effectuate the Merger and a wholly-owned subsidiary of NOVI, with the address of 7909 Parkwood Circle Drive, Houston, Texas 77036 in the Proxy.. Merger Sub is a citizen of the States of Ohio and Texas.

## DEFENDANTS' FIDUCIARY DUTIES

24. Under applicable law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to act in utmost good faith and loyalty to the corporation and its shareholders.

25. To diligently comply with these duties, the directors and/or officers may not take any action that:

(a) adversely affects the value provided to the corporation's shareholders;

- 5 -

(b)    will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)    contractually prohibits themselves from complying with their fiduciary duties;

(d)    will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

26.    In accordance with their duties of loyalty and good faith, defendants, as directors and/or officers of R&M, are obligated under applicable law to refrain from:

(a)    participating in any transaction where the directors' or officers' loyalties are divided;

(b)    participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)    unjustly enriching themselves at the expense or to the detriment of the public shareholders.

27.    Plaintiff alleges herein that defendants, separately and together, in connection with the Merger, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, candor, good faith and independence owed to plaintiff and other public shareholders of R&M.  Defendants stand on both sides of the transaction, are engaging in self dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiff or the Class, and choosing not to provide shareholders with all information necessary to make an informed decision in connection with the Merger.  As a result of defendants' self dealing and divided

- 6 -

loyalties, neither plaintiff nor the Class will receive adequate or fair value for their R&M common stock in the Merger.

28.     Because defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Merger, the burden of proving the inherent or entire fairness of the Merger, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## FACTUAL BACKGROUND

29.     R&M is a leading supplier of engineered equipment and systems for critical applications in global energy, industrial, chemical and pharmaceutical markets.  R&M operates primary businesses in 15 countries.  The majority of R&M's products, systems and services are sold in the oil & gas, chemical and pharmaceutical market sectors.  A list of the markets served follows:

•Oil & Gas; •Chemical; •Cosmetics; •Pharmaceutical; •Biotechnology; •Biofuels;
•Food; •Semiconductor; •Water & Wastewater Treatment; •Flue Gas Desulfurization;
•Pulp & Paper; •Mineral Processing; and •Polymer/Plastics

30.     R&M has performed well for its investors.  On August 9, 2010, R&M's stock traded at $23.99 and on August 8, 2012, before the announcement of the Merger, R&M was trading at $46.80.  In two years, the stock price gained over 150%:



31.     The Company has had an earnings growth rate of over 20% for the past five years and analysts estimate double-digit earnings growth for the next five years as well. All indications are that the Company is poised for future success and the market reflected that sentiment.

32.     For instance, on June 26, 2012, R&M announced its Third Quarter 2012 results:

> Consolidated sales were $266 million in the third quarter of 2012 as compared with $237 million in the third quarter of 2011. Excluding the impact of currency translation sales grew $34 million, or 14%, over the prior year period. The Company reported third quarter 2012 orders of $286 million, an increase of 10% over the prior year period excluding the impact of currency translation. Third quarter ending backlog increased to $315 million, up from $301 million at the end of the second quarter and $248 million at the end of the third quarter of the prior year. Each of Robbins & Myers' business platforms achieved solid growth.

> Third quarter 2012 earnings before interest and taxes (EBIT) were $62 million, including a $2 million favorable legal settlement, and significantly higher than the adjusted EBIT of $47 million reported in the third quarter of 2011. EBIT margin of 23.2% in the third quarter of 2012 was substantially higher than the 19.8% adjusted EBIT margin in the prior year period, as a result of improved profitability in each business platform and 70 basis points from the legal settlement. The Company reported EBITDA of $69 million in the third quarter of 2012, compared with adjusted EBITDA of $54 million in the third quarter of fiscal 2011. Each business segment showed improved profitability as a result of additional volume, and the Process & Flow Control group benefitted from price and cost improvements.

33.     The Company was growing with reported EBITDA of $69 million in the third quarter of 2012, compared with adjusted EBITDA of $54 million in the third quarter of fiscal 2011. Each business segment showed ***improved profitability*** as a result of additional volume, and the Process & Flow Control group benefitted from price and cost improvements.

34.     R&M generated $61 million of cash from operating activities in the third quarter of fiscal 2012 compared with $39 million in the prior year same quarter.

35.     Likewise, on March 27, 2012, R&M Announced its Second Quarter 2012 results:

> Consolidated sales were $256 million in the second quarter of 2012 as compared with $184 million in the second quarter of 2011. Excluding the impact of currency translation and T-3, sales grew 24% over the prior year period. The Company reported second quarter 2012 orders of $294 million, which included orders of $96 million for T-3. Excluding the impact of currency translation and T-3, orders increased 35% over the prior year period. Second quarter ending backlog was

$301 million, compared to $221 million at the end of the prior year period and $260 million at the end of the prior quarter. Each of Robbins & Myers' business segments achieved strong growth.

36. Once again, R&M achieved strong growth with ending order backlog of $301 million, compared to $221 million at the end of the prior year period and $260 million at the end of the prior quarter.

37. In the 2011 annual report, the CEO told shareholders that "by every measure – financial and strategic – Robbins & Myers had a tremendous year as we established a higher level of performance across the Enterprise."

38. It was also reported in the Company's 2011 annual report that operating profit increased 890 basis points over the previous year:

**Strong Markets, Strong Execution**

Fiscal 2011 started strong and continued to gain momentum as our businesses experienced significant growth in sales, orders, margins and cash flow during the 12-month period. Consolidated operating profit as a percentage of sales, excluding special items, increased 890 basis points over the previous year and climbed above 19 percent for the first time in at least 25 years. Earnings more than doubled year-over-year to reach $2.38 per share, excluding special items such as the gain from the sale of Romaco, restructuring-related costs and the one-time costs relating to the acquisition of T-3 Energy Services. Cash from operating activities exceeded $100 million, and we finished the year with $231 million of cash and virtually no debt.

39. To be sure, R&M's CEO has been very vocal with regards to R&M and the fact it has exceeded all expectations. Moreover, the CEO himself acknowledges that R&M continues to meet and exceed shareholder expectation, the achievements to date are just the beginning, and R&M continues to justify higher trading multiples. What follows is "A Conversation With Peter Wallace" which is posted on R&M's website:

1.

Q. What has driven Robbins & Myers' success?

A: We began our transformation with a few simple themes – reduce complexity, manage those things that are under our control, and create an

- 9 -

environment where people are rewarded for their passion and ability to continuously improve the business.

Now, a few years later, we have surpassed just about everyone's expectations – and we still have a lot happening that will drive further improvements.

Q:    Where can the business go from here?

A:    We firmly believe that our achievements to-date are Just the Beginning, the theme we are using throughout our company. Given the success we have had, some of you may be wondering what I could possibly mean by this. After all, we have had great performance and it is difficult to keep improving the business.

While I agree that higher sales levels, higher operating profit margins, and improved cash flow will make a quantum leap more difficult; it is also clear that we have numerous activities underway that will improve our results. We have a lot of positive momentum that will continue to drive higher sales volume and produce improved operating margins.

Q.    How have shareholders responded to Robbins & Myers transformation?

A:    We continue to meet or exceed the guidance provided to the investment community and our performance has attracted a wider following. This additional interest has increased the daily volume of trading activity which, in turn, helps attract others to the stock. Our trading volume and share price have steadily increased over the last few years. Investors reward companies that consistently deliver the numbers and have plans in place to improve future performance. Our results have justified higher trading multiples due to the fact we now have a reputation for producing results – doing what we said we would do.

We have several positives currently in our favor. All our platform businesses are profitable and have shown steady improvement during the last two years. End-markets are healthy and with approximately 80% of our sales into the energy, chemical, and pharmaceutical sector, we believe that we are in the right place at the right time. Another item of great importance is that we have moved from a high debt position of a few years ago, to our current status of having more cash than debt. This net cash position will be valuable as we continue to move forward with the growth phase of our transformation, as we fund internal growth plans as well as acquisitions.

**THE MERGER**

40.    Despite the Company's booming prospects on stand-alone basis, in December 2011, without discussing the matter with the Board, the Company's management team began working with Citi to engineer a sale of the Company. At management's behest, Citi initially put together a list of

- 10 -

784679_1

eight potential buyers to contact. The Proxy does not disclose the criteria Citi used to select this list of potential bidders.

41.     At the Board meeting on January 5, 2012, the Board discussed various options for the Company, including share repurchases, acquisitions and business combinations. The Proxy does not disclose any analysis of these potential scenarios.

42.     At the behest of management, the Board also discussed a potential sale of the Company, and agreed to permit Citi to contact a limited number of potential buyers. The Board also directed, however, that Company management continue with the Company's share repurchase program and pursue acquisition opportunities. There is no indication in the public filings that management followed the Board's directive and undertook either of these initiatives. The Proxy does not disclose any analysis of these strategic alternatives, nor does it disclose why these initiatives were not undertaken.

43.     Over the next few months, Citi contacted a number of buyers, eleven in total, including NOVI. The Company entered into confidentiality agreements with at least two of these buyers. The Proxy does not disclose whether these confidentiality agreements contain standstill agreements that prevent these potential buyers from making an offer for the Company directly to its shareholders. For various reasons that are not disclosed in the Proxy, each of these potential buyers declined to move forward in the process, leaving NOVI as the only buyer and thus in a position to secure a bargain basement auctionless price for the Company.

44.     Without any other bidders in the process, NOVI was able to secure the Board's agreement to sell the Company for less than its intrinsic value. Without determining if the Merger was superior to other stand alone options, the Board agreed to sell R&M to NOVI for $60 per share.

45.     On August 9, 2012, the Company issued a press release announcing the Merger:

> . . . Robbins & Myers, Inc. and National Oilwell Varco, Inc. have entered into an agreement under which National Oilwell Varco will acquire Robbins & Myers in

- 11 -

an all cash transaction that values Robbins & Myers at approximately $2.5 billion. Under the agreement, Robbins & Myers' shareholders will receive $60.00 per share in cash in return for each of the approximately 42.4 million shares outstanding ("the Transaction"). The Boards of Directors of National Oilwell Varco and Robbins & Myers have unanimously approved the transaction, which is subject to customary closing conditions, including the approval of two-thirds of Robbins & Myers shareholders. Closing would be expected to occur in the fourth quarter of calendar 2012.

Robbins & Myers' largest shareholder, M.H.M. & Co., Ltd, which owns approximately 10% of the outstanding common shares of Robbins & Myers ("Common Stock") has agreed to vote its Common Stock in favor of the Transaction in accordance with the terms of a support agreement entered into in respect of the Transaction. The support agreement will terminate in the event the merger agreement is terminated in accordance with recommendation of the Board of Robbins & Myers.

Mr. Pete Miller, Chairman, President and CEO of National Oilwell Varco, remarked, "Robbins & Myers has many complementary products with those National Oilwell Varco currently offers the industry. I am particularly enthusiastic about the prospect of incorporating their downhole tools, pumps and valves into National Oilwell Varco Petroleum Services & Supplies and Distribution & Transmission segments. We feel that our combined manufacturing infrastructure and portfolios of technology will further advance our presence in the oil and gas markets we serve. We are extremely excited about this combination and look forward to welcoming a very talented group of employees into the National Oilwell Varco family."

Mr. Pete Wallace, President and Chief Executive Officer of Robbins & Myers, commented, "Robbins & Myers Board of Directors believes that the proposed transaction with National Oilwell Varco represents a compelling value for our shareholders. This transaction allows Robbins & Myers to join forces with an industry leader that will enable its business segments to fully capitalize on their respective strategies, enhance leadership positions in niche applications, and execute growth plans at a faster pace. We have worked hard to create a focused business with reduced complexity and a culture of continuous improvement, all based on improving customer productivity and profitability. This is the right time for this transaction and I believe National Oilwell Varco is the right partner to take us to the next level of performance."

National Oilwell Varco, headquartered in Houston, Texas, is a worldwide leader in the design, manufacture and sale of equipment and components used in oil and gas drilling and production operations, the provision of oilfield services, and supply chain integration services to the upstream oil and gas industry.

46.     In light of R&M's impressive performance and growth, R&M was in a position to effectively bargain in order to receive higher bids for the Company, as the directors' fiduciary duties demand.  The Board failed to do so.

47.     Combining these two companies will consolidate NOVI's position as a global supplier of blowout preventers.  R&M is already the fourth-largest maker of blowout preventers for drilling rigs on land and NOVI is the second.  Together, they will be one of the largest, if not the largest, supplier of blowout preventers in the world.

48.     The timing of the Merger is also convenient.  In fact, lawmakers eager to prevent another oil spill in the Gulf of Mexico have been insisting on new standards for blowout preventers, a last line of defense against runaway wells.  Federal regulators at the Interior Department are also debating new rules that could boost the chances the 450-ton safety devices would stop a blowout by shearing through pipe and cutting off the oil and natural gas.

49.     Brian Uhlmer, an analyst at Global Hunter Securities LLC in Houston who rates R&M and NOVI a buy, commented that R&M is the fourth-largest maker of blowout preventers for drilling rigs on land and he estimated NOVI to be the second.  In response to news about the Merger, Uhlmer said this is a departure for NOVI which "usually likes fixer-uppers," and R&M "is pretty well fixed up.  Not a lot to improve and squeeze out."

50.     Indeed, R&M is growing and expanding and the Merger ignores this reality.

51.     The Merger Agreement locks the Company into the takeover, precluding the possibility of topping bids.  There are termination fee triggers for the Company to pay NOVI as high as $75 million.  There is a no shop provision preventing the Company to solicit alternative proposals. There is a reaffirmation provision requiring the Company to reaffirm support for the Merger in the event there is a tender offer.  There are critical information and matching rights for NOVI were a topping bidder to emerge.  The layering effect of these and other deal protection devices thwart the

- 13 -

possibility of a topping bidder and deprives the Company's shareholders from receiving proper value

for their shares through a fair and impartial process, binding the Company's shareholder to the

takeover by NOVI.

52.     Defendants' motive for entering into the flawed transaction is clear.  They are

motivated to secure monetization for their illiquid equity holdings in the Company, and to secure

other change-in-control benefits that are only available to them if the Company is acquired by a

third-party.  This motive provided defendants with the incentive to push forward with the Merger

instead of pursuing stand alone options like the share repurchase and/or acquisition scenarios that the

Board directed management to consider along with a sale to a third-party.

53.     For example certain defendants and members of the Company's management team

will secure the following golden parachute awards if the Merger is consummated:

### Change-in-Control and Termination Compensation

| Name (a) (1) | Cash ($) (b) (2) | Equity ($) (c) (3) | Pension/NQDC ($) (d) (4) | Perquisites/Benefits ($) (e) (5) | Tax Reimbursement ($) (f) (6) | Total ($) (h) (7) |
|---|---|---|---|---|---|---|
| Peter C. Wallace, President & Chief Executive Officer | 4,640,800 | 5,431,554 | 0 | 20,437 | 0 | 10,092,791 |
| Kevin J. Brown, Interim Chief Financial Officer, | 452,250 | 526,984 | 0 | 15,328 | 0 | 994,562 |
| Saeid Rahimian, Senior Vice President & President, Energy Services Group | 858,900 | 1,667,742 | 0 | 15,328 | 0 | 2,541,970 |
| Jeffrey L. Halsey, Vice President, Human Resources | 541,785 | 731,826 | 0 | 15,328 | 0 | 1,288,939 |

54.     Certain defendants and members of the Company's management team will secure

immediate vesting and monetization of the following illiquid Company equity awards:

| Executive | Stock Options | Restricted Share Units | Performance Share Awards |
|---|---|---|---|

- 14 -

784679_1

| | | | |
|---|---|---|---|
| Peter C. Wallace | $1,428,594 | $1,437,240 | $2,565,720 |
| Kevin J. Brown | $124,864 | $213,240 | $188,880 |
| Saeid Rahimian | $429,102 | $463,680 | $774,960 |
| Jeffrey L. Halsey | $198,186 | $176,880 | $356,760 |

| Name | Restricted Stock (#) | Value of Restricted Stock ($) (a) | Restricted Share Units (#) | Value of Restricted Share Units ($) (a) | Stock Options (#) | Value of Stock Options ($)(b) | Performance Shares (#) (c) | Value of Performance Shares(a) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **Peter C. Wallace**, President and Chief Executive Officer | -0- | -0- | 23,954 | $1,437,240 | 50,156 | $1,428,594 | 42,762 | $2,565,720 | $5,431,554 |
| **Kevin J. Brown**, Interim Chief Financial Officer | -0- | -0- | 3,554 | 213,240 | 5,681 | 124,864 | 3,148 | 188,880 | 526,984 |
| **Saeid Rahimian**, Senior Vice President and President Fluid Management Group | -0- | -0- | 7,728 | 463,680 | 15,023 | 429,102 | 12,916 | 774,960 | 1,667,742 |
| **Jeffrey L. Halsey**, Vice President, Human Resources | -0- | -0- | 2,948 | 176,880 | 6,954 | 198,186 | 5,946 | 356,760 | 731,826 |
| **Aaron H. Ravenscroft**, Vice President and President Process & Flow Control Group | 9,666 | 579,960 | 1,900 | 114,000 | 7,270 | 170,772 | 1,900 | 114,000 | 978,732 |
| **Michael J. McAdams**, Treasurer | 1,000 | 60,000 | -0- | -0- | -0- | -0- | -0- | -0- | 60,000 |
| **Linn S. Harson**, Corporate Secretary and General Counsel | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| **Richard J. Giromini**, Director | 1,199 | 71,940 | -0- | -0- | -0- | -0- | -0- | -0- | 71,940 |
| **Stephen F. Kirk**, Director | 1,199 | 71,940 | -0- | -0- | -0- | -0- | -0- | -0- | 71,940 |
| **Andrew G. Lampereur**, Director | 1,199 | 71,940 | -0- | -0- | -0- | -0- | -0- | -0- | 71,940 |
| **Thomas P. Loftis**, Director and Chairman of the Board | 1,199 | 71,940 | -0- | -0- | -0- | -0- | -0- | -0- | 71,940 |
| **Dale L. Medford**, Director | 1,199 | 71,940 | -0- | -0- | -0- | -0- | -0- | -0- | 71,940 |
| **Albert J. Neupaver**, Director | 1,199 | 71,940 | -0- | -0- | -0- | -0- | -0- | -0- | 71,940 |

55.     In an attempt to secure shareholder support for the unfair Merger, on August 31,

2012, defendants issued the materially false and misleading Proxy.  The Proxy, which recommends

that R&M shareholders vote in favor of the Merger, omits and/or misrepresents material information

as set forth below, in contravention of §§14(a) and 20(a) of the 1934 Act.

56.     ***The share repurchase and acquisition alternatives***.  The Board chose to state the

reasons for Board's recommendation of the Merger in the Proxy in the section titled

"Recommendation of our Board of Directors; Reasons for the Merger" on page 34-37 of the Proxy.

784679_1

Specifically, in that section on page 35, the Proxy specifically states that the Board considered "the limited advantageous strategic alternatives available to us if we proceeded on a standalone basis" in connection with the Board's consideration of the Merger.

57.     At the same time, the Proxy omits material information regarding these strategic alternatives. The Proxy, on page 29, presents share repurchases and acquisitions as two strategic alternatives that the Board explicitly recognized as potentially "enhancing shareholder value" and were that the Board specifically pursued in 2011, the Company's "transitional year." The Proxy further states on page 29 that:

> On January 5, 2012, at our Board of Directors' regularly scheduled meeting, Peter C. Wallace, our President and Chief Executive Officer, reviewed with our Board of Directors information compiled by Citi regarding possible strategic alternatives. These alternatives included share repurchases, acquisitions and business combinations. After a lengthy discussion, our Board of Directors determined that given our very strong financial performance in what was possibly the high-point in the business cycle of many of our end markets, in order to maximize shareholder value, we should contact a small number of strategically positioned companies to gauge interest, if any, in combining with us. The Board of Directors also determined that we would continue with our share repurchase program as well as pursue acquisition opportunities.

Yet, the Proxy fails to disclose any analysis of these share repurchase and acquisition scenarios, nor does it explain the current status of either strategy or why the Merger is preferable for shareholders.

58.     The omission of the above information is material because shareholders are entitled to be informed of: (i) stand-alone options that may provide greater long-term value for shareholders than the consideration offered by NOVI, before they are asked to vote in favor of the Merger; and (ii) the extent of the Board's consideration of the stand-alone options in the context of their consideration of the Merger, necessary for the Company's shareholders to make a meaningful decision on whether they agreed with the Board's recommendation in favor of the Merger.

59.     The omission of the above information renders the statement on page 35 in the Proxy that the Board considered "the limited advantageous strategic alternatives available to us if we

- 16 -

proceeded on a standalone basis" under the section "Recommendation of our Board of Directors; Reasons for the Merger" misleading.  As set forth in ¶¶4, 44, 52: (i) the Board agreed to sell R&M to NOVI without determining if the Merger was superior to other stand-alone options; and (ii) defendants pushed forward with the Merger instead of pursuing stand alone options like the share repurchase and/or acquisition scenarios, which would have increased the Company's long-term value and provided more consideration to R&M shareholders than is being paid by NOVI, to obtain personal benefits.  Without the omitted information, however, the Proxy creates the misleading impression that the Merger is a better deal for the Company's shareholders than other stand-alone options, including the share repurchase and acquisition scenarios, and that the Board was fully informed and carefully considered stand-alone alternatives for the Company, including the share repurchase and acquisition scenarios, before and in connection with making their recommendation to the Company's shareholders that the Merger is in the best interests of the Company and its shareholders.

60.     ***Potential Buyers.***  The Board chose to make statements regarding certain potential buyers in connection with the Board's recommendation of the Merger and solicitation of R&M shareholders' votes in the Proxy in the section titled "Background of the Merger" on page 29-34. Specifically, the Proxy states that:

- "representatives of Citi contacted nine strategically positioned companies (for a total of eleven companies including NOV and Company A) to determine interest" (Proxy at 30);

- "Company B indicated that it might be interested in a transaction with us" and R&M "entered into a confidentiality agreement with Company B" (Proxy at 30);

- "Company D indicated that it might be interested in a business combination with us" and R&M "entered into a confidentiality agreement with Company D" (Proxy at 31); and

- "Six of the nine indicated that they were not interested in proceeding and the other three (Company B, Company C and Company D — discussed below) eventually declined as well" (Proxy at 30).

61.     At the same time, the Proxy omits material information regarding these potential buyers.  The Proxy fails to disclose the bases for Citi's selection of the companies to contact; sufficient information to assess whether the confidentiality agreements entered into with any party contained "standstill" provisions that, among other things, would prevent these competing bidders from making a tender offer to the Company's public shareholders, or otherwise communicating with shareholders in any manner; and the bases provided by the potential parties for declining to pursue an acquisition of the Company.

62.     The omission of the above information is material because shareholders are entitled to be informed of: (i)  the efforts undertaken by the Board to secure the best price available for the Company's shares in a sale, especially when the efforts are guided by a financial advisor, Citi, who is incentivized by its engagement agreement with the Company to ensure a sale even if it is not the best option for shareholders; (ii) the likelihood of a superior offer for the Company, especially when the Merger Agreement contains terms locking up potential competing bidders; and (iii) information necessary to gauge whether the Merger is the best deal possible under the circumstances.

63.     The omission of the above information renders the following statements misleading: (i) the statements in ¶60; and (ii) the statements in the Proxy that the Board determined that the Merger and the Merger Agreement to be in the "best interests" of the Company and the Company's shareholders (on pages 1, 3, 22, 34, 37).  As set forth in ¶¶40, 42-44, 46-50: (i) self-interested R&M management spearheaded a sale of the Company and conflicted Citi put together the list of the potential buyers and took the lead role in contacting the potential buyers; (ii) the Board failed to follow a process to provide the Company's shareholders from receiving a higher bid for the

- 18 -

Company and instead secured a bargain-basement price from NOVI; and (iii) defendants pushed forward with the Merger  not for the merits of the deal but to obtain personal benefits.  Without the omitted information, however, the statements in the Proxy identified in ¶60 create the misleading impression that the Merger Consideration was the result of a competitive bidding process and that the Board actively pursued a sales process to secure the highest offer for the Company rather than the best deal for the Company's shareholders.

64.     The omission of the above material also renders misleading the statement in the "Recommendation of our Board of Directors; Reasons for the Merger" section on page 35 of the Proxy, that the Board considered "the structure of the merger and terms and conditions of the Merger Agreement, including: that the Merger Agreement does not preclude a third party from making a proposal for an acquisition of or business combination with us and, that under certain circumstances, we may provide information to and negotiate with such a third party and our Board may change its recommendations to the shareholders regarding the merger; and that the Merger Agreement requires NOV to pay our reasonable and documented expenses (not to exceed $50 million) if we terminate the Merger Agreement as a result of certain breaches of the Merger Agreement by NOV."  Without the omitted information, the Company's shareholders are unable to determine if there is an additional impediment than the deal protection devices in the Merger Agreement beyond the preclusive deal protection devices discussed in ¶51, that preclude any of the parties from making a competing superior proposal.

65.     ***With respect to Citi's Discounted Cash Flow Analysis, the inputs and assumptions used by Citi to determine the discount rate range of 11.0%-13.0%***.  The Proxy does not disclose the inputs and assumptions used to derive the discount rate Citi employed in its analysis.

66.     The omission of this information is material because the selected discount range has a huge impact on the outcome of the DCF, and therefore the discount rate selected is critical to a

determination of fairness (generally speaking, the higher the discount rate, the lower the resulting value). Without disclosure of how Citi determined the discount rate applied, shareholders cannot determine if the outcome of Citi's DCF is an adequate measure of the Company's intrinsic value, and thus do not have the information necessary to make a competent decision whether to vote in favor of the Merger.

67. This omission renders the statement in the Proxy on page 40 that the DCF analysis indicates an implied per share equity range of $51.58 to $68.16 as compared to the $60.00 Merger Consideration misleading. Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether the $51.58 to $68.16 range reflects the Company's value or is the result of Citi's subjective choice of discount rates, and are unable to reject Citi's opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

68. ***With respect to Citi's Discounted Cash Flow Analysis, the implied terminal EBITDA multiples observed***. The Proxy does not disclose the implied terminal EBITDA multiples observed by Citi in its DCF.

69. The omission of this information is material because without this information, shareholders cannot determine if the terminal multiple applied to the final year of the projections is adequate to measure the Company's expected growth on a stand alone basis, and thus cannot assess whether the DCF adequately measures the Company's intrinsic value.

70. This omission renders the statement in the Proxy on page 40 that the DCF analysis indicates an implied per share equity range of $51.58 to $68.16 as compared to the $60.00 Merger Consideration misleading. Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether the $51.58 to $68.16 range reflects the Company's value or is the result of unreasonable terminal multiple assumption, and are unable to reject Citi's

- 20 -

opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

71.     ***With respect to Citi's Discounted Cash Flow Analysis, how stock-based compensation was treated***.  The Proxy does not disclose how stock-based compensation was treated in Citi's DCF analysis.

72.     The omission of this information is material because there is no standard method for treating stock-based compensation in the investment community but the manner is which stock-based compensation is treated in a DCF analysis, either as a cash or non-cash expense, can have a significant impact on the outcome of this analysis.  Without this information, shareholders cannot assess the actual intrinsic value of their shares in the Company, and thus cannot make a fully informed decision whether to vote in favor of the Merger.

73.     This omission renders the statement in the Proxy on page 40 that the DCF analysis indicates an implied per share equity range of $51.58 to $68.16 as compared to the $60.00 Merger Consideration misleading.  Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether that range reflects the Company's value or is the result of Citi's subjective decision on how to treat stock-base compensation, and are unable to reject Citi's opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

74.     ***With respect to Citi's Selected M&A Transactions Analysis, the individually observed multiples for each of the selected transactions***.  The Proxy discloses summary statistics for the multiples observed by Citi, but does not disclose the individual multiples observed for each of the selected transactions.

75.     The omission of this information is material because the comparability of the Company to the selected transactions forms the foundation for this analysis, but without the

- 21 -

individually observed multiples, shareholders do not have the information to determine how the selected transactions actually compare to the Merger.

76.     This omission renders the statement in the Proxy on page 40 that the Selected M&A Transactions analysis indicates an implied per share equity range of $45.31-$75.58 as compared to the $60.00 Merger Consideration misleading.  Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether that range reflects transactions comparable to the Merger or is the result of Citi's unreasonable judgment, and are unable to reject Citi's opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

77.     ***With respect to Citi's Selected M&A Transactions Analysis, the portion of the transaction period that was deemed by Citi to be most comparable, and which transactions were encompassed by that determination***.  The Proxy states:

- that Citi reviewed "33 selected publicly announced M&A transactions announced since January 1, 2000" (Proxy at 41);

- "Citi then compared the EBITDA multiples derived from the selected transactions with the corresponding EBITDA multiples implied in the merger based on the merger consideration of $60.00 per share" (Proxy at 43);

- "This analysis indicated the high and low LTM EBITDA multiples for the selected M&A transactions ranged from 5.8x to 17.2x, while the range of multiples of the portion of such period deemed by Citi to be most comparable, including as a result of similar U.S. rig count trends and near term rig activity outlook to that reported in the current market, was 7.9x to 14.7x"  (Proxy at 43); and

- "Based on its professional judgment and taking into consideration the observed LTM EBITDA multiples for the selected M&A transactions, Citi applied a range of selected LTM EBITDA multiples of 7.0x to 12.0x" (Proxy at 43).

78.     Yet, the Proxy does not disclose what transaction period was deemed most "comparable," or which transactions were included in that period in Citi's Selected M&A Transactions Analysis.

79.     The omission of this information is material because the Citi's selected range of 7.0x to 12.0x is in the low range of the previous 5.8x to 17.2x range result, and without this information, shareholders have no way of determining if Citi selected an appropriate sample of transactions to derive the multiples relied on in the analysis.

80.     This omission renders the statement in the Proxy on page 40 that the Selected M&A Transactions analysis indicates an implied per share equity range of $45.31-$75.58 as compared to the $60.00 Merger Consideration misleading.  Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether that range reflects transactions comparable to the Merger or is the result of Citi's unreasonable judgment, and are unable to reject Citi's opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

81.     ***With respect to Citi's Selected Public Companies Analysis, the individually observed multiples for each of the selected companies and the resulting value indications from application of each of the separate multiple ranges***.  The Proxy discloses summary statistics for the multiples observed by Citi in its Selected Public Companies Analysis on page 44, but does not disclose the individual multiples observed for each of the selected companies nor does it disclose the value ranges derived from each set of multiples.

82. The omission of this information is material because without the individually observed multiples and resulting value ranges, shareholders do not have the information to determine how the selected companies actually compare to R&M, and thus are unable to assess whether Citi has adequately compared the Company's market performance to its selected comparables. This particularly true here, where the selected and applied multiples are at the lower end of the observed ranges, and because of the number of forward multiples and differentiation of the selected companies in the analyses.

83. This omission renders the statement in the Proxy on page 44 that the Selected Public Companies Analysis indicates an implied per share equity range of $43.04-$59.54 as compared to the $60.00 Merger Consideration misleading. Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether that range reflects companies comparable to the Merger or is the result of Citi's unreasonable judgment, and are unable to reject Citi's opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

84. ***The financial projections provided line items provided to NOV and Citi, including: (i) depreciation and amortization; (ii) stock-based compensation expense; (iii) EBIT; (iv) capital expenditures; and (v) changes in working capital***. The Proxy states that:

- "our management provided to NOV, as well as to Citi in connection with its evaluation of the fairness of the merger consideration, non-public, internal financial forecasts regarding our anticipated future operations for our August 31, 2013 through 2017 fiscal years" (Proxy at 46);

- Citi "examined certain financial forecasts and other information and data relating to us provided to or discussed with Citi by our management" in arriving at its fairness opinion (Proxy at 38);

- "With respect to the financial forecasts and other information and data provided to or otherwise reviewed by or discussed with Citi, Citi was advised by our management, and Citi assumed, with our consent, that such forecasts and other information and data were reasonably prepared on bases reflecting the best currently available estimates and judgments of our management as to our future financial performance" (Proxy at 39); and

- Citi performed a discounted cash flow based on the projections provided to it by management (Proxy at 40).

85.     At the same time, the Proxy does not disclose critical line items in the projections, including: (i) depreciation and amortization; (ii) stock-based compensation expense; (iii) EBIT; (iv) capital expenditures; and (v) changes in working capital.

86.     The omission of this information renders the Proxy materially misleading because these significant line items influence the calculation of free cash flow and shareholders are entitled to be informed of management's best estimates of the Company's future cash flows, especially when the projections formed the basis for the fairness opinion offered by the Board's financial advisor.

87.     This omission renders the "revenue," "EBITDA," and "Unlevered, After-Tax Free Cash Flow" numbers for 2013-2017 on page 47 of the Proxy misleading, because without the omitted information, these numbers are materially incomplete.

88.     Moreover, this omission renders the statement in the Proxy on page 40 that the DCF analysis indicates an implied per share equity range of $51.58 to $68.16 as compared to the $60.00 Merger Consideration misleading. Without the omitted information, the Company's shareholders are unable to make any meaningful determination whether that range reflects the Company's value or is the result of Citi's unreasonable judgment, and are unable to reject Citi's opinion that the Merger Consideration is fair from a financial point of view, to the Company's shareholders.

89.     Collectively, by omitting the critical information regarding Citi's financial analyses, as discussed above, shareholders were not able not to assess the reliability of Citi's analyses and all shareholders were left with was the conclusion of "fair value" with no meaningful way to reject that conclusion.

90.     Moreover, collectively, the omitted information regarding Citi's financial analyses renders the statement on page 35 in the Proxy that the Board considered Citi's financial analyses and fairness opinion as supporting the Merger  under the section "Recommendation of our Board of Directors; Reasons for the Merger" misleading.  As set forth in ¶5, the Merger Consideration significantly undervalues the long-term value of the Company and its performance and is merely an attempt by NOVI to acquire R&M at a discount.  Without the omitted information, the Proxy creates the misleading impression that the Citi's fairness analyses and fairness opinion is reliable.

91.     In sum, the Merger is the product of a hopelessly flawed process that is designed to ensure the sale of R&M to NOVI on terms preferential to defendants and other R&M insiders at the expense of the interests of plaintiff and the other public stockholders of the Company.

92.     By abusing their power as directors and officers, defendants are attempting to strategically subvert the interests of plaintiff and the other public shareholders of R&M.  Thus, plaintiff seeks to enjoin the Merger.

93.     If consummated, the Merger will likely result in R&M's shareholders losing their interest in the Company through a fraudulent process designed to inhibit other potential bidders in favor of NOVI.  Unless enjoined by this Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Merger, which will deprive Class members of a fair and non-fraudulent sales process, all to the irreparable harm of plaintiff and the Class.

94.     As such, plaintiff and the class of R&M shareholders are irreparably injured and have

no adequate remedy at law.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action individually and as a class action on behalf of all holders of

R&M stock who are being and will be harmed by defendants' actions described below (the "Class").

Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other

entity related to or affiliated with any defendants.

96.     This action is properly maintainable as a class action.

97.     The Class is so numerous that joinder of all members is impracticable.  According to

R&M's SEC filings, as of May 31, 2012, there were over 40 million shares outstanding, held by

hundreds, if not thousands, of beneficial holders.

98.     There are questions of law and fact which are common to the Class and which

predominate over questions affecting any individual Class member.  The common questions include,

*inter alia*, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of

undivided loyalty, independence or due care with respect to plaintiff and the other members of the

Class in connection with the Merger;

(b)     whether the Individual Defendants are engaging in self dealing in connection

with the Merger;

(c)     whether the Individual Defendants have breached their fiduciary duty to

secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and

the other members of the Class in connection with the Merger;

(d)     whether the Individual Defendants are unjustly enriching themselves and other

insiders or affiliates of R&M;

- 27 -

(e)      whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Merger, including the duties of good faith, diligence, honesty and fair dealing;

(f)      whether the Individual Defendants have breached their fiduciary duties of candor to plaintiff and the other members of the Class in connection with the Merger by failing to disclose all material information concerning the Merger;

(g)      whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(h)      whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(i)      whether defendants acted in contravention of §§14(a) and 20(a) of the 1934 Act or Rule 14a-9.

99.      Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

100.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

101.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

102.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

784679_1

103.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.    Plaintiff brings this action derivatively in the right and for the benefit of R&M to redress injuries suffered, and to be suffered, by R&M as a direct result of the breaches of fiduciary duty and the violations of federal law by the defendants.

105.    Plaintiff will adequately and fairly represent the interests of R&M and its shareholders in enforcing and prosecuting its rights.

106.    Plaintiff has not made demand on the Board to file suit for the violations of state and federal law alleged herein because such a demand was a futile and useless act, particularly for the following reasons:

(a)     All of the directors on the Board are named as wrongdoers and defendants in this lawsuit;

(b)     All of the directors on the Board are alleged to have committed violations of federal and state law for which they are accountable to the Company and to the Company's shareholders;

(c)     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein, including over $28.6 million in the monetization of vested and unvested equity holdings and golden parachute compensation only if the Merger is consummated;

(d)     Each defendant approved the unfair Merger at issue in this matter;

(e)     Each defendant was in the possession of non-public information regarding the Merger and the material omissions and misleading disclosures at issue in this litigation;

- 29 -

(f)     Each defendant reviewed the Proxy before it was disseminated;

(g)     Each defendant was responsible for the disclosures and omissions in the Proxy;

(h)     Each defendant recommended that the Company's shareholders vote in favor of the unfair Merger in the Proxy;

(i)     Each defendant ordered the dissemination of the Proxy to the Company's shareholders;

(j)     Each defendant violated the individual rights of the Company's shareholders to make a fully informed vote on the Merger by disseminating a flawed Proxy;

(k)     Each defendant continues to refuse to correct the false and/or misleading statements in the Proxy with any subsequent filing;

(l)     In order to bring this suit, all of the directors of R&M would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(m)     The acts complained of constitute violations of the fiduciary duties owed by R&M officers and directors and these acts are incapable of ratification;

(n)     Any suit by the directors of R&M to remedy these wrongs would likely expose the Individual Defendants and R&M to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(o)     Each member of the R&M Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options and other emoluments by virtue of their Board membership and control over the Company, the continuation of which is dependent upon their cooperation with the other members of the Board of Directors, and their

- 30 -

participation and acquiescence in the wrongdoing set forth herein and are therefore incapable of exercising independent objective judgment in deciding whether to bring this action;

(p)     Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment;

(q)     The Board has wrongfully refused to bring suit against themselves on behalf of the Company after a litigation demand letter from at least one shareholder based on defendants' breaches of fiduciary duty in connection with the Merger, confirming that the Board's minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed; and

(r)     The Board has refused to correct the false and/or misleading statements in the Proxy after having specific notice of its defects from plaintiff, confirming that the Board's minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed.

107.    Plaintiff has not made any demand on R&M shareholders to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     R&M is a publicly traded company with over 40 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Class Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

108.    Plaintiff repeats and realleges each allegation set forth herein.

109.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of R&M and have acted to put their personal interests and the interest of NOVI and Merger Sub ahead of the interests of R&M's shareholders.

110.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive plaintiff and other members of the Class of the true value of their investment in R&M.

111.    The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with NOVI without regard to the fairness of the transaction to R&M's shareholders, by failing to make adequately informed and reasonable decisions in connection with the Merger, and by failing to disclose all material information concerning the Merger to such shareholders.

112.    As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of R&M because, among other reasons:

(a)    they unreasonably failed to take steps to maximize the value of R&M to its public shareholders to cap the price of R&M's stock and to give defendants an unfair advantage, by, among other things, failing to solicit other potential acquirors or alternative transactions;

(b)    they failed to properly value R&M;

- 32 -

(c)     they consciously disregarded their duty to provide good faith consideration to the best interests of the Company and its shareholders;

(d)     they failed to make adequately informed and reasonable decisions in connection with the Merger;

(e)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger; and

(f)     they failed to disclose all material information that would permit R&M's stockholders to cast a fully informed vote on the Merger.

113.     Because the Individual Defendants dominate and control the business and corporate affairs of R&M, and are in possession of private corporate information concerning R&M's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of R&M which makes it inherently unfair for them to pursue any transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

114.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have knowingly or recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.  The Individual Defendants are engaging in self dealing, are not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the members of the Class.

115.     As a result of defendants' unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive the real value of their equity ownership of the Company and will not be able to cast informed vote with all material information concerning the Merger.  Unless the Merger is enjoined by the Court, defendants will continue to knowingly or

- 33 -

recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Merger terms, and will not supply to R&M's shareholders sufficient information to enable them to cast informed votes on the Merger and may consummate the Merger, all to the irreparable harm of the members of the Class.

116.    Plaintiff and the members of the Class have an inadequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### Derivative Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

117.    Plaintiff repeats and realleges each allegation set forth herein.

118.    The Individual Defendants have violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the Company and have acted to put their personal interests ahead of the interests of the Company.

119.    The Individual Defendants have violated their fiduciary duties by entering into the Merger without regard to the fairness of the transaction to R&M.

120.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the Company because, among other reasons, they failed to ensure a fair process and consciously disregarded their duty to provide good faith consideration to the best interests of the Company and its shareholders.

121.    By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward the Company.

784679_1

122.    As a result of the actions of defendants, the Company has been and will be irreparably harmed.

123.    Unless the Merger is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to the Company and will continue to work to consummate the unfair Merger, all to the irreparable harm of the Company.

124.    The Company has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can the Company be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT III

### Class Claim for Violation of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants

125.    Plaintiff repeats and realleges each allegation set forth herein.

126.    Individually and in concert, the Individual Defendants disseminated the false and misleading Proxy specified above, which contained statements that, in violation of §14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not materially false or misleading.

127.    The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

128.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

129.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available

- 35 -

Case: 3:12-cv-00281-TSB Doc #: 40 Filed: 11/19/12 Page: 37 of 42  PAGEID #: 1041

to shareholders.  The Proxy is an essential link in causing plaintiff and the Company's shareholders to approve the Merger.

130.    By reason of the foregoing, defendants have violated §14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

131.    Because of the false and misleading statements in the Proxy, plaintiff and other R&M shareholders are directly threatened with irreparable harm and deprivation of their right to a fully informed vote,  rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT IV

### Derivative Claim for Violation of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants

132.    Plaintiff repeats and realleges each allegation set forth herein.

133.    Individually and in concert, the Individual Defendants disseminated the false and misleading Proxy specified above, which contained statements that, in violation of §14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not materially false or misleading.

134.    The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

135.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

136.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available

- 36 -

to shareholders.  The Proxy is an essential link in causing plaintiff and the Company's shareholders to approve the Merger.

137.    By reason of the foregoing, defendants have violated §14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

138.    Because of the false and misleading statements in the Proxy, the Company is threatened with irreparable harm and with the interference of proper governance on its behalf that follows the free and informed exercise of the stockholders' right to make an informed vote regarding a corporate merger.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT V

### Claim for Violation of §20(a) of the 1934 Act
### Against the Individual Defendants, NOVI and Merger Sub

139.    Plaintiff repeats and realleges each allegation set forth herein.

140.    The Individual Defendants, NOVI and Merger Sub acted as controlling persons of R&M within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of R&M and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

141.    Each of the Individual Defendants, NOVI and Merger Sub was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

- 37 -

142.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were thus directly involved in the making of the Proxy.

143.     NOVI and Merger Sub also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

144.     By virtue of the foregoing, the Individual Defendants, NOVI and Merger Sub have violated §20(a) of the 1934 Act.

145.     As set forth above, the Individual Defendants, NOVI and Merger Sub had the ability to exercise control over and did control a person or persons who have each violated §14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, R&M shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class and derivative action;

B.     Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of defendants and is therefore unlawful and unenforceable;

C.     Declaring that defendants herein, and each of them, have violated §§14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

- 38 -

D.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Merger, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for shareholders;

E.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of R&M's shareholders until the process for the sale or auction of the Company is completed and the highest possible value is obtained;

F.      Rescinding, to the extent already implemented, the Merger or any of the terms thereof;

G.      Implementation of a constructive trust, in favor of plaintiff, upon any benefits improperly received by defendants as a result of their wrongful conduct;

H.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

I.      Granting such other and further equitable relief as this Court may deem just and proper.

DATED: November 19, 2012       MEYER WILSON CO., LPA
                                      MATTHEW R. WILSON

                                      s/Matthew R. Wilson
                                      MATTHEW R. WILSON (Ohio Bar #0072925)
                                      BRIDGET M. WASSON (Ohio Bar #0084457)
                                      1320 Dublin Road, Suite 100
                                      Columbus, OH  43215
                                      Telephone:  614/224-6000
                                      614/224-6066 (fax)
                                      Email:  mwilson@meyerwilson.com
                                      Email:  bwasson@meyerwilson.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
CULLIN A. O'BRIEN
120 East Palmetto Park Rd., Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
Email:  sdavidson@rgrdlaw.com
Email:  cobrien@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
RANDALL J. BARON
TRAVIS E. DOWNS III
DAVID T. WISSBROECKER
(admitted *pro hac vice*)
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
Email:  darrenr@rgrdlaw.com
Email:  randyb@rgrdlaw.com
Email:  travisd@rgrdlaw.com
Email:  dwissbroecker@rgrdlaw.com
Email:  elee@rgrdlaw.com

RYAN & MANISKAS, LLP
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA  19087
Telephone:  484/588-5516
484/450-2582 (fax)
Email:  rmaniskas@rmclasslaw.com

(other attorneys not admitted in Ohio to file *pro hac
vice*)

*Attorneys for Plaintiff*

- 40 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2012, the foregoing VERIFIED SECOND

AMENDED DERIVATIVE AND CLASS ACTION COMPLAINT was filed with the Clerk of

Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

 s/ Matthew R. Wilson_____
Matthew R. Wilson

784679_1