UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| J. ROBERT SMITH, Individually and On Behalf of All Others Similarly Situated, | : | Case No. 3:12-cv-281 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| ROBBINS & MYERS, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS (Doc. 60)**

This civil action is before the Court on Defendants'[1] joint motion to dismiss (Doc. 60), and the parties' responsive memoranda (Docs. 64, 65).

## I.    FACTS AS ALLEGED BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the third amended complaint ("TAC") in the light most favorable to the Plaintiff; and (2) take all well-pleaded factual allegations as true.  *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

On November 30, 2012, the Board of Directors of Robbins & Meyers, Inc. ("R&M" or "the Company") filed a Definitive Proxy Statement ("Proxy") with the Securities and Exchange Commission ("SEC"), seeking shareholder approval of the sale of the Company to National Oilwell Varvo, Inc. ("NOVI") (the "Merger" or "Acquisition").  In the Proxy, the Board told shareholders that the Merger was in the

---

[1] Defendants include Robbins & Myers, Inc. ("R&M"), Peter C. Wallace, Thomas P. Loftis, Richard J. Giromini, Stephen F. Kirk, Andrew G. Lampereur, Dale L. Medford, Albert J. Neupaver, National Oilwell Varco, Inc., and Raven Process Corp. (collectively, "Defendants").

shareholders' best interests and the $60 per share consideration was a fair price. At the same time, the Board failed to provide material information to the Company's shareholders, necessary to assess the truthfulness of those representations. Among other things, the Board failed to inform the shareholders that, by voting for the Merger, the shareholders were giving up strategic alternatives that promised greater long-term value for the Company's shareholders than the $60 per share Merger consideration. By failing to disclose material information in the Proxy, the Board caused shareholders to cast an uninformed vote in favor of the Merger. Plaintiff maintains that the Board's conduct in this regard violated Section 14(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 14a-9 promulgated thereunder (collectively "§14(a)").

Plaintiff alleges that the Merger was the product of a fundamentally flawed process conducted in breach of Defendants' fiduciary duties under state law. Under Ohio law, each and every member of the Board, as corporate fiduciaries, owed the Company and its shareholders a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. Plaintiff maintains that each and every Board member breached these independent duties to shareholders by, among other things: (i) tainting the sales process with conflicts of interest; (ii) relying on flawed financial analyses; (iii) failing to adequately inform itself of the value of the Company and the fairness of the Merger consideration; (iv) approving the Merger in order to secure personal benefits unrelated to the merits of the transaction; and (v) failing to disclose fully and fairly all

material information about the Merger in the Proxy, preventing the Company's shareholders from being able to exercise their individual rights of corporate suffrage.

NOVI completed its acquisition of R&M on February 20, 2013.  For his cooperation, Defendant Peter Wallace, the Company's President and Chief Executive Officer, obtained a payout of more than $10.5 million.

R&M is a leading supplier of engineered equipment and systems for critical applications in global energy, industrial, chemical, and pharmaceutical markets.  (Doc. 53 at ¶ 28).  On August 9, 2012, R&M announced that the Company and NOVI had entered into an agreement (the "Merger Agreement") under which NOVI will acquire R&M for $60.00 in cash.  (*Id.* at ¶ 2).

Prior to the announcement of the Merger, the R&M Board had not been seeking to be acquired by another company.  (*Id.* at ¶ 3).  However, that focus quickly changed in the winter of 2011 when Wallace began working with Citigroup Global Markets, Inc. ("Citi") to engineer a sale of the Company.  (*Id.*)

In December 2011, the Company's management agreed to receive a presentation from at least two financial advisors – Citi and UBS Securities LLC ("UBS").  (*Id.* at ¶ 39).  Citi focused on two strategic alternatives for R&M: a sale of the Company or acquisitions by the Company of other businesses.  (*Id.*)

In comparison, UBS ("UBS's December 2011 Presentation") focused on four strategic alternatives: a sale of the Company; acquisitions by the Company for other businesses; share repurchases; or a "reverse Morris Trust" with another company.  (*Id.*)

UBS further calculated a financial comparison for those four strategic alternatives and came up with the following discounted cash flow ("DCF")[2] mispoints for each strategic alternative: (i) a sale of the Company: $71.46; (ii) acquisitions of other companies: $69.45; (iii) share repurchases: $65.14; and (iv) a "reverse Morris Trust" or a "transformational merger of equals": $73.77.  (*Id*.)

There is no indication that the Board authorized or was aware of either presentation.  (*Id*. at ¶ 40).

R&M's management hand-picked Citi to run a sales process.  (*Id*. at ¶ 41).  UBS was familiar with the Company because UBS had recently served as the Company's financial advisor in connection with a $422 million transaction.  (*Id*.)  R&M's management, however, favored Citi because the members of Citi's team were, like management, incentivized to complete a sale of the Company.  (*Id.*)  Citi's team was made up of members who: (i) had recently left UBS citing inadequate compensation; and (ii) wanted to establish Citi's new "energy group" as dealmakers.  (*Id*.)

There is no indication that the Board authorized or was aware of the circumstances under which Citi began to work for the Company.  (*Id*. at ¶ 42).

The Company's management subsequently began to pressure the Board to agree to explore a sale of the Company.  (*Id*. at ¶ 44).  At a Board meeting on January 5, 2012, the

---

[2]  DCF is a valuation method used to estimate the attractiveness of an investment opportunity. DCF analysis uses future free cash flow projections and discounts them to arrive at a present value, which is used to evaluate the potential for investment.

Board "approved Mr. Wallace's recommendation to approach two specified companies to determine interest in a possible transaction." (*Id.*)

Although the Board had only authorized the Company's management to approach "two specified companies," the Company's management reached out to whomever they wanted. (*Id.* at ¶ 46). According to the Proxy, from February 21, 2012 to March 29, 2012, management had Citi contact eleven potential companies (including NOVI) and the Company entered into confidentiality agreements with three companies (including NOVI). (*Id.*)

There is no indication that the Board authorized or was aware of Citi's work in this regard. Defendants did not disclose in the Proxy whether the Board authorized or was aware of Citi's communications with potential buyers. (*Id.*)

When the Board was informed of the potential transaction with NOVI, the Board failed to form a special committee comprised of independent directors to ensure that future negotiations with NOVI were conducted on an independent basis and for the best interest of R&M's common stockholders. (*Id*. at ¶ 4). Moreover, the Board did not restrict Wallace or Citi from spearheading the negotiation of the Merger (though they were conflicted by their self-interests in the Merger) and failed to determine whether other strategic alternatives were more valuable for R&M shareholders than a sale of the Company. (*Id.*)

For the next several months, Wallace and Citi neglected to inform the R&M Board of their ongoing discussions with potential bidders and ignored viable strategic

alternatives to a sale of the Company that were potentially more valuable for the Company's shareholders. (*Id.*)

At least one potential buyer indicated that it would like more time to consider a potential transaction (*i.e.*, the buyor "suggest[ed] 2H 2012 may be more appropriate"). (*Id.* at ¶ 47). Because of management's urgency to sell, NOVI was left as the only potential buyer and thus in a position to secure a bargain basement price of the Company. (*Id.* at ¶ 48).

The Board recognized that the Company's shares were worth at least "mid-60's per share." (*Id.*) The Board, however, agreed to sell the Company to NOVI at $60.00 per share. (*Id.*)

Plaintiff claims that the Board failed to adequately deliberate before entering into the Merger and failed to require Citi to adequately assess the fairness of the Merger consideration to the Company's shareholders. (*Id.* at ¶ 5). In particular, Citi presented the Board flawed financial analyses that significantly undervalued the Company in order to make the Merger consideration appear fair to the Company's shareholders, when it was not. (*Id.*)

For example, Citi's DCF analysis – which Citi utilized to calculate the implied equity value of the Company to be $51.58-$68.16 as compared to the $60.00 Merger consideration – included serious flaws. (*Id.* at ¶ 50). In this analysis, Citi utilized a grossly inflated "weighted average cost of capital" ("WACC") of 11% to 13% in their discounted cash flow analysis, driving down the valuation of a company. (*Id.* at ¶ 50).

Before receiving NOVI's offer, Citi was using a lower WACC for R&M in its analysis. (*Id.*) UBS also used a lower WACC for R&M in its analysis. (*Id.*) Had Citi utilized a reasonable WACC (*e.g.*, the 9-11% WACC utilized by UBS), its DCF analysis would have resulted in a significantly higher valuation of R&M, resulting in the Merger consideration falling outside and below the range of fairness. (*Id.*)

Citi's Selected M&A Transactions Analysis – which Citi utilized to calculate the implied equity value of the Company to be $45.31-$75.58 as compared to the $60.00 Merger consideration – also included serious flaws. (*Id.* at ¶ 52). In this analysis, Citi selected a range of multiples of 7.0x to 12.0x from the range of multiples of 7.9x to 14.6x derived from the transactions deemed "most comparable" by Citi. (*Id.* at ¶¶ 52-54). By selecting these low range of multiples (with the low end falling below the range of the "most comparable" transaction), Citi's Selected M&A Transactions Analysis yielded a significantly lower current valuation of a company. (*Id.* at ¶ 54). Had Citi utilized reasonable multiples (*e.g.*, based on the transactions Citi deemed most comparable), its Selected M&A Transactions Analysis would have resulted in a significantly higher valuation of R&M, resulting in the Merger consideration falling outside and below the range of fairness. (*Id.*)

Finally, Citi's Selected Public Companies Analysis – which Citi utilized to calculate the implied equity value of the Company to be $43.04-$59.54 as compared to the $60.00 Merger consideration – also included serious flaws. (*Id.* at ¶ 55). Departing from custom, Citi did not incorporate control premium value in this analysis. (*Id.*) Had

Citi appropriately reflected a control premium in this analysis, its Selected Public Companies Analysis would have resulted in a significantly higher valuation of R&M, resulting in the Merger consideration falling outside and below the range of fairness. (*Id.*)

Additionally, Plaintiff claims that when UBS conducted a valuation of the Company, it used extrapolated projections which were substantially more pessimistic than R&M's management's projections.  (*Id*. at ¶ 56).  If UBS's analyses were redone based on the same R&M management's projections underlying Citi's fairness opinion, then UBS's analyses would have resulted in a significantly higher valuation of R&M, resulting in the Merger consideration falling outside and below the range of fairness. (*Id.*)

Plaintiff maintains that the Board did not discharge its obligation to observe and criticize the fundamental flaws in Citi's analyses and/or require Citi to provide an accurate picture of the fairness of the Merger consideration.  (*Id.* at ¶ 57).  Moreover, R&M's Board made no attempt to analyze the value of strategic alternatives in comparison to the Merger consideration.  (*Id.* at ¶ 58).  Importantly, none of these flaws were disclosed to shareholders in the Proxy, preventing shareholders from being able to critically assess Citi's valuation analysis.  (*Id*. at ¶ 109).

Plaintiff alleges that the Company's management was motivated to secure monetization for their illiquid equity holdings in the Company, and to secure other change-in-control benefits that were only available to them if the Company was acquired

by a third-party.  (*Id.* at   ¶¶ 62-64).  The Merger triggered, for example, a payout of more than $10.5 million for Wallace.  (*Id.* at ¶ 63).  The Merger also triggered a payout of almost $5 million for the other members of the Company's management.  (*Id.*)

On the other hand, the Merger did not adequately compensate the Company's former shareholders for their investments in the Company.  (*Id.* at ¶ 65).  The Merger price significantly undervalued R&M.  (*Id.* at ¶¶ 65-72).  The Merger consideration did not compensate the Company's shareholders for R&M's current value or for its growth prospects.  (*Id.* at ¶ 71).

Despite these flaws, the Board agreed to finalize the Merger with preclusive deal protection measures that thwarted the prospect of a topping bidder and prevented R&M shareholders from being able to maximize their equity stake in the Company.  (*Id.* at ¶ 73).  These deal protection devises included: (i) a no-shop clause that precluded the Board from providing confidential Company information to or even communicating with potential competing bidders except under extremely limited circumstances; (ii) a matching rights provision that required the Board to permit NOVI three business days to match (but not top) any superior proposal that emerges; and (iii) a termination fee provision that required an alternate buyer of R&M to pay $75 million to NOVI in the event the Merger Agreement was terminated in favor of a superior proposal.  (*Id.*)

Plaintiff maintains that on November 30, 2012, Defendants filed a materially false and misleading Proxy in contravention of Sections 14(a) and 20(a) of the 1934 Act and Defendants' fiduciary duties under state law.  (*Id.* at ¶ 75).  The Proxy, which

recommended that R&M's former shareholders vote in favor of the Merger, omitted and/or misrepresented material information about: (i) the sales process for the Company; (ii) strategic alternatives for the Company; (iii) the Company's financial projections; and (vi) the flawed financial analyses conducted by Citi.  (*Id.* at ¶¶ 75-109).

Plaintiff alleges that as a result of the false and misleading Proxy, the Company's former shareholders were precluded from casting a fully informed vote in connection with the Merger and many agreed to give up their equity interests in the Company in exchange for the inadequate Merger consideration, which made the Proxy an essential link in damaging shareholders.  Defendants announced the completion of the Merger on February 20, 2013.  (*Id.* at ¶ 8).

In the TAC, Plaintiff alleges claims for: *Count I*: class claim for violation of Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder against the individual defendants; *Count II*: derivative claim for violation of Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder against the individual defendants; *Count III*: class claim for violation of Section 20(a) of the 1934 Act against the individual defendants, NOVI and merger sub; *Count IV*: derivative claim for violation of Section 20(a) of the 1934 Act against the individual defendants, NOVI and merger sub; *Count V*: class claim for breach of fiduciary duties and aiding & abetting against the individual

Defendants and NOVI;[3] and *Count VI*: derivative claim for breach of fiduciary duties against the individual Defendants and NOVI.

Defendants argue that: (1) Plaintiff may not obtain any post-closing damages for his breach of fiduciary duty claims because of Ohio's appraisal statute; (2) Plaintiff's direct claims must be dismissed because they should have been brought as derivative claims; (3) Plaintiff's derivative claims must be dismissed for failure to plead demand futility; (4) Plaintiff's breach of fiduciary duty claims must be dismissed pursuant to Ohio's business judgment rule; (5) Plaintiff's Section 14(a) allegations are not adequately pled with particularity and do not plead "loss causation"; and (6) Plaintiff's Section 20(a) claim fails because it is dependent on a viable Section 14(a) claim.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted."  To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[3] Plaintiff subsequently withdrew the aiding and abetting claims.  "In light of the state of unsettled Ohio law regarding aiding and abetting, and to streamline this litigation, plaintiff withdraws his aiding and abetting claims."  (Doc. 64 at 3, fn. 1).

544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

# III.    ANALYSIS

## A.  Dissenting Shareholder Statute (Ohio's appraisal statute)[4]

First, Defendants maintain that the Dissenting Shareholder Statute bars Plaintiff from seeking post-transaction damages for his breach of fiduciary duty claims (Counts V and VI).

Courts have recognized that there are instances when a shareholder's right of appraisal is not sufficient to compensate him for the injury done.  "[The] appraisal remedy…may not be adequate in certain cases particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets or gross and palpable overreaching are involved."  *Terry v. Carney,* No. OT-94-054, 1995 Ohio App. LEXIS 5754, at *13 (Ohio App. Dec. 29, 1995) citing *Cede & Co v. Technicolor, Inc*., 542 A.2d 1182, 1187 (Del. 1988).  "An action for breach of fiduciary duty may be maintained outside the appraisal statute, R.C. 1701.85; however, such action may not seek to overturn or modify the fair cash value determined in a cash out merger."  *Stepak v. Schey*.

---

[4] Appraisal statutes, in general, provide a means to compensate shareholders who dissent from fundamental changes in a corporate structure such as through merger or the sale of assets. *Armstrong v. Marathon Oil Co*., 513 N.E.2d 776, 782 (Ohio 1987).  Such statutes provide for an appraisal of the dissenting shareholders' stock, and the subsequent purchase of such stock by the corporation.  *Id.*

553 N.E.2d 1072, 1074 (Ohio 1990).[5]  A cause of action outside of the appraisal statute

will not be recognized "where the shareholder's objection is essentially a complaint

regarding the price which he received for his shares." *Id.* at 1075.[6]  In *Stepak*, the

plaintiff did not allege that his shares were undervalued – rather he alleged that he should

have received more money for his shares – thus "[s]uch action, merely asking for more

money, per *Armstrong* must be brought under the appraisal statute." *Id.* at 1076.

Here, Plaintiff alleges that the shares were in fact undervalued.  The derivative

breach of fiduciary duty claim (Count VI) seeks an equitable pro rata recovery award for

the damages *caused to R&M* by Defendants.  (Doc. 53 at ¶ 46).  Additionally, the direct

breach of fiduciary duty claim (Count V), challenges the Board's self-dealing and the

substantive fairness of the merger process.  The TAC alleges that Defendants breached

their fiduciary duties by tainting the sales process with self-interest, relying on flawed

---

[5] Ohio law explicitly allows Plaintiff to pursue post-transaction damages outside of the appraisal proceeding as long as his breach of fiduciary duty claims are genuine and not merely disguised complaints about the price received in the transaction.  *State ex rel. Ohio Co. v. Maschari*, 553 N.E.2d 1356, 1358 (Ohio 1990) (determining that appraisal was not the exclusive remedy for a post-transaction breach of fiduciary duty claim where the trial court had found that "genuine fraud and breach of fiduciary claims [were] asserted").

[6] In Ohio, the Dissenting Shareholder Statute provides that the "fair cash" value of a dissenting shareholder's shares "shall be the closing sale price on the national securities exchange as of the applicable date provided in division (c)(1) of this section."  Ohio Rev. Code § 1701.85(c)(2). The "applicable date" in connection with a merger is defined as "the day prior to the day on which the vote by the shareholders was taken, as long as the stock was still publically-traded "immediately before the effective time of a merger or consolidation."  Ohio Rev. Code §§ 1701.85(c)(1) and (c)(2)(A).  The price of the stock on the last pre-merger trading day was $59.40.  When the shareholder vote was taken on December 27, 2012, the closing price of R&M's stock on December 26, 2012 was $59.40 (Doc. 60, Ex. D), and the last day on which R&M's stock was publically-traded on the NYSE was February 20, 2013 (*Id.*, Ex. C).

financial analyses, making material decisions without adequate information, and approving the Merger in order to secure personal benefits unrelated to the merits of the transaction. (Doc. 53 at ¶¶ 154-164). Additionally, the TAC alleges that Defendants secured the unfair merger by soliciting shareholder votes with a false and misleading Proxy. *See, e.g., Terry*, 1995 Ohio App. LEXIS 5754 (in finding that plaintiff's claims were not barred by Ohio Revised Code § 1701.85, the court noted that plaintiff's claims "allege breaches of fiduciary duty regarding amounts it loaned to" a third party and further alleged that "defendants breached their fiduciary duties in overcharging for services rendered and other self-dealing which virtually destroyed [its] investments.").[7]

Accordingly, considering the TAC in the light most favorable to Plaintiff, the Court finds that Plaintiff's allegations are not simply about merger consideration, and thus the appraisal statute does not bar this action.[8]

### B. Standing

Next, Defendants maintain that Counts I, II, and V (the purported class action claims) must be dismissed for lack of standing under Ohio law.

---

[7] *See also Murray & Murray Co. v. Performance Indus., Inc.*, 701 N.E.2d 475, 482 (Ohio Com. Pl. 1998) (stating that the Supreme Court of Ohio in *Maschari* "note[d] that the key for determining validity of actions outside the appraisal action is the nature of the conduct allegedly causing damages, not the form of redress itself").

[8] While the Court acknowledges that the TAC repeatedly refers to complaints of "inadequate price," "bargain basement price," "unfair price," and an "inadequately-priced deal," Plaintiff also alleges claims that are not based on the cash value of the merger. (Doc. 53 at ¶¶ 2, 8, 48, 49).

The Court must determine whether Counts I, II, and V are direct or derivative claims.

> A shareholder's derivative action is brought by a shareholder in the name of the corporation to enforce a corporate claim.  Such a suit is the exception to the usual rule that a corporation's board of directors manages or supervises the management of a corporation.  A derivative action allows a shareholder to circumvent a board's refusal to bring a suit on a claim.  On the other hand, if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action.

*Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989).  Typically, shareholders only have standing to bring a direct cause of action if they suffer an injury separate and distinct from that suffered by the company.  *Id.*

In analyzing whether a complaint states a derivative or direct claim, the court looks at the nature of the alleged wrong rather than the designation used by the plaintiff. *Grand v. Owens*, 620 N.E.2d 234, 237 (Ohio App. 1993).  A court must preliminarily determine if the pleadings state an injury to the plaintiff upon an individual claim as distinguished from an injury that indirectly affects shareholders or affects them as a whole.  *Adair v. Wozniak*, 492 N.E.2d 426, 428 (Ohio 1986).[9]  A shareholder "does not have an independent cause of action where there is no showing that he has been injured in any capacity other than in common" with other shareholders.  *Id.* at 429.  In *Adair*, the

---

[9] "As a general proposition, actions for breach of fiduciary duties are to be brought in derivative suits." *Kadel v. Dayton Superior Corp.*, 731 N.E.2d 1244, 1246 (Ohio Com. Pl. 2000) (finding that plaintiff did not allege any injury to himself or the other members of his purported class which was separate and independent from the alleged injury suffered commonly by all other shareholders).

court found that plaintiff's allegation that defendant directors had breached their duties of loyalty and care were derivative in nature.  However, plaintiff's statutory right to inspect the books and records, demand an accounting, call a special membership meeting, or be compensated for a wrongful exclusion from the organization, implicate individual rights and result in special injuries that are distinct from an injury suffered by all members.  *Id.* at 1127-1128.  Accordingly, the court determined that such claims were direct.  *Id.*

"[D]iminution in the value of stock resulting from a wrong to the corporation is ordinarily a derivative claim and not a direct or class claim."  *Henkel v. Aschinger*, 962 N.E.2d 395, 403 (Ohio Com. Pl. 2012) (where plaintiffs only alleged an injury to the company's stock price the court found that "the consolidated complaint contains nothing that truly differentiates any of the four named plaintiffs from the other public shareholders").[10]  However, *Henkel* is distinguishable from the instant case because the only viable claims in *Henkel* were related to stock price.  Conversely, Plaintiff has alleged that Defendants directly harmed him and the Company's shareholders by failing to disclose all material information while soliciting shareholder approval of the merger, and preventing him and the Company's shareholders from being able to exercise their individual rights of corporate suffrage.  (Doc. 53 at ¶ 8) (alleging that the flawed Proxy

---

[10] "Although there are gray areas between derivative actions and suits brought by shareholders for their own benefit, diminution in the value of stock resulting from a wrong to the corporation is ordinarily a derivative claim and not a direct or class claim."  Liability of Corporate Officers and Directors, § 18.01 at 3 (Matthew Bender & Co. 2011).  Defendants also cite *Adair*, 492 N.E.2d at 429 and *Kadel*, 731 N.E.2d at 1246, for the proposition that Plaintiff's claims are derivative.  However, neither *Adair* nor *Kadel* involved disclosure allegations.

precluded the Company's shareholders "from casting a fully informed vote" on the Merger).[11]  *See, e.g., Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio 2003) (where alleged injuries "implicate individual rights of a member," "[t]hese are special injuries that are distinct from an injury suffered by all members" and "[t]herefore, these are direct claims").[12]

Accordingly, Counts I, III, and V are properly pled as direct claims.[13]

---

[11]  *See also Rudolph v. Cyberonics, Inc.*, No. H-66-2671, 2007 U.S. Dist. LEXIS 28869, at *9 (S.D. Tex. Apr. 19, 2007) ("This allegation indicates that the shareholders' voting rights have been impaired, which suggests that the shareholders have been damaged and that the claim is direct.").

[12]  *See also Terry*, 1995 Ohio App. LEXIS 5754 (holding that in a close corporation, allegations of breach of fiduciary duties owed to minority shareholders were direct claims).

[13]  Defendant alleges that the same principle applies to Section 14(a) claims, and because proxy disclosure claims are derivative under Ohio law, Plaintiff's Section 14(a) claims are also derivative. However, violations of Section 14(a) can be either direct or derivative.  *See, e.g., J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (holding that "a right of action [under Section 14(a)] exists as to both derivative and direct causes"); *Black v. Cincinnati Fin. Corp.*, No. 1:11cv210, 2011 U.S. Dist. LEXIS 46852, at *9-25 (S.D. Ohio May 2, 2011) (permitting and analyzing both direct and derivative Section 14(a) claims).  Specifically, the Section 14(a) claim here is based on allegations that Defendants prevented the Company's shareholders from casting an informed vote on a merger and therefore it is the Company's shareholders and their individual, corporate suffrage rights that are implicated and harmed – making it a direct claim. "[I]t is not unusual for a court to allow [Section 14(a)] claims to proceed by class action and derivatively at the same time."  *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 589 (D. Colo. 2002).  *See, e.g., In re Bank of Am. Corp. Sec. Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 291-92 (S.D.N.Y. 2010) ("material omissions from a proxy statement could directly injure the corporation as well as the corporation's shareholders"; "Both suits [referring to a derivative 14(a) suit and a direct 14(a) suit] may proceed."); *In re Dayco Corp. Deriv. Sec. Litig.*, 102 F.R.D. 624, 630 (S.D. Ohio 1984) (adopting, in the context of an action under Section14(a), the "virtually unanimous" rule that "one counsel can represent a stockholder bringing both an individual and a derivative action").

### C. Demand Futility

Next, Defendants maintain that Plaintiff has not pled demand futility and thus lacks standing to bring claims derivatively.

The TAC alleges that all directors are named Defendants and all Defendants affirmatively participated in the complained-of wrongdoing, including their actions in connection with the Merger and proxy statement at issue in this litigation.  (Doc. 53 at ¶ 124(a)-(r).  This Court previously found that demand was futile where "director defendants are the very same people who approved the pay hikes and bonuses, and plaintiff has named all directors who approved the compensation as defendants" and "the directors did not merely approve the transaction, they also recommended to the shareholders that the shareholders approve the compensation."  *NECA-IBEW Pension Fund v. Cox*, No. 1:11cv451, 2011 U.S. Dist. LEXIS 106161, at *14-15 (S.D. Ohio Sept. 20, 2011).  However, the Northern District of Ohio has repeatedly rejected the proposition that demand is excused when all directors approved the challenged transaction and are named as defendants.  *See, e.g., Robinson Family Trust v. Greig*, No. 5:12cv1713, 2013 U.S. Dist. LEXIS 66995, at *17-19 (N.D. Ohio May 10, 2013) ("This Court agrees that the Ohio Supreme Court would not conclude that simply naming all of the members of a Board of Directors as defendants is sufficient to excuse demand.");[14]

---

[14]  The *Robinson* court explained that a derivative plaintiff must plead particularized facts showing that the directors' conduct with respect to the transaction "is so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of liability therefore exists."  *Id.* at 9-10.

*Monday v. Meyer*, No. 1:10cv1838, 2011 U.S. Dist. LEXIS 136858, at *17 (N.D. Ohio Nov. 29, 2011) ("[D]irectorial approval of a challenged board decision is insufficient on its face to raise a reasonable doubt about a director's objectivity. Shareholders would be able to regularly sidestep the demand requirement if all that was required was a showing that board members agreed to or approved some challenged decision.");[15] *In re Keithley Instruments, Inc.*, 599 F. Supp. 2d 875, 883-84 (N.D. Ohio 2008).[16]

Here, Plaintiff has not alleged demand futility by virtue of Defendants' status as directors, or by Defendants' passive approval of corporate measures. The TAC alleges the Board's active participation in the sales process and Proxy. (*See, e.g.,* Doc. 53 at ¶ 124(f)-(i)) ("Each defendant reviewed the Proxy before it was disseminated"; "Each defendant was responsible for the disclosures and omissions in the Proxy"; "Each defendant recommended that the Company's shareholders vote in favor of the unfair

---

[15] In *Monday*, there was no allegation that all directors took an active role in the misconduct – Plaintiff only generally alleged that the directors were guilty by virtue of their corporate status. *Id.*

[16] In *Keithley*, the court considered whether futility was sufficiently pled where: (i) plaintiffs alleged that the directors generally "approved" the grants; but (ii) did not allege that the directors had specific knowledge of the impermissible nature of the grants. The *Keithley* court indicated that directors who merely approved the transaction were not interested for the purposes of assessing demand futility. *Id.* at 907. However, directors who affirmatively approved a wrongful transaction were interested for the purposes of assessing demand futility. *Id.* at 895 (directors on the compensation committee who specifically approved the backdating options were interested for the purposes of demand futility). *Lewis v. Graves*, 701 F.2d 245, 249 (2nd Cir. 1983) and *Keithley* are part of a distinct line of cases involving a corporate board's approval of stock grants and the subsequent shareholder's challenges to those grants as impermissible or illegal. In that specific context, the *Lewis* and *Keithley* courts considered whether futility was sufficiently alleged where: (i) the directors generally "approved" the grants; but (ii) the directors did not have specific knowledge of the impermissible nature of the grants. The second prong distinguishes these cases from the instant case.

Merger in the Proxy"; "Each defendant ordered the dissemination of the Proxy to the Company's shareholders").  Similarly, in *Fradkin v. Ernst*, the plaintiff alleged demand would be futile "because all of the directors at the time of the purported adoption of the Option Plan and issuance of the Proxy statement are defendants; and they are all alleged to have committed violations of federal and state law for which they are accountable to the Company and to the class; so that the directors of the Company have irreconcilable conflicts of interest which render them incapable of considering objectively whether it is in the Company's best interest to pursue this litigation."  571 F. Supp. 829, 840 n.20 (N.D. Ohio 1983).[17]

Accordingly, Plaintiff has sufficiently pled demand futility.

### D. Breach of Fiduciary Duty

Next, Defendants maintain that even if Plaintiff had standing, his breach of fiduciary duty claims (Counts V and VI) fail under Ohio's business judgment rule.

In a merger context, "directors may not, in breach of their fiduciary duties, act unfairly to the disadvantage of their corporation or its shareholders."  *Stepak*, 553 N.E.2d at 1078.  To support a claim for breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) injury proximately caused by the breach."  *Garvais v. Reliant Inventory Solutions, Inc.*, 2:09cv389, 2012 U.S. Dist.

---

[17]  *See also Smith v. Robbins*, No. 3:12cv281, 2012 U.S. Dist. LEXIS 164868, at *9 (S.D. Ohio Nov. 19, 2012) ("Plaintiff need not actually prove liability of each defendant at this stage in the litigation in order to show demand futility.  Plaintiff's allegations that all directors are named defendants in this action and all defendants actively participated in the alleged wrongdoing is sufficient under Ohio law to demonstrate demand futility).

LEXIS 131558, at *15 (S.D. Ohio Sept. 14, 2012).  Ohio law provides a statutory presumption that directors "act independently, in good faith, and having in mind the best interests of the corporation."  *Henkel*, 962 N.E.2d at 405 (citing Ohio Rev. Code §1701.59(c)(1)).  "The decisions of disinterested [fiduciaries] will not be disturbed if they can be attributed to any rational business purpose."  *In re Goodyear Tire & Rubber Co. Derivative Litig.*, 5:03cv2180, 2007 U.S. Dist. LEXIS 1233, at *31-32 (N.D. Ohio Jan. 5, 2007).  However, directors "cannot claim protection of the business judgment rule when they have failed to comply with the second requirement of the rule, and have breached the duty of loyalty."  *Kelly v. Wellsville Foundry Inc.*, No. 99-co-27, 2000 Ohio App. LEXIS 6287, at *24 (Ohio App. Dec. 6, 2000).

Plaintiff maintains that the Board acted disloyally and in bad faith in the following ways: (1) by pursuing financial benefits at the cost of shareholder value (Doc. 53 at ¶¶ 3, 4, 38, 62-64); by permitting conflicted parties to control the sales process (*Id.* at ¶¶ 4, 38, 41-43, 46-48); by relying on flawed financial analyses (*Id.* at ¶¶ 5, 49-57); by failing to adequately inform itself of the value of the Company and the fairness of the Merger consideration (*Id.* at ¶¶ 5, 39-40, 49-59); by failing to adequately consider the interests of the Company's shareholders in obtaining maximum value for their shares (*Id.* at ¶¶ 4, 39-40, 46-59, 65-72); by agreeing to sell the Company for unfair consideration (*Id.* at ¶¶ 5, 65-72); by agreeing to preclusive deal protection devices without good faith consideration of the best interest of the Company's shareholders (*Id.* at ¶¶ 6, 73-74); and by failing to disclose material information in the Proxy seeking shareholder approval of

22

the Merger, injuring the Company's shareholders by preventing them from being able to exercise their individual rights of corporate suffrage (*Id.* at ¶¶ 7-8, 75-112).  These allegations are sufficient to support a claim that the Board's actions were the result of fiduciaries' improper attempts to obtain personal interests – not the result of fiduciaries who acted impartially for the benefit of the Company and its shareholders in breach of the Board's duty of loyalty.

Defendants argue that Plaintiff's claims fail because Defendants had no duty to maximize shareholder value.[18]  However, even if Defendants had no duty to maximize shareholder value, they had a duty to act in good faith.  *See, e.g., Hollinger Int'l, Inc. v. Hollinger Inc*., No. 04C0698, 2005 U.S. Dist. LEXIS 21305, at *82 (N.D. Ill. Mar. 11, 2005) ("In other words, directors violate their duty of good faith if 'they knew that they were making material decisions without adequate information and without adequate deliberation.'").

Accordingly, the Court finds that the TAC adequately pleads a claim for breach of fiduciary duty, so that any presumption of the business judgment rule has been rebutted and Defendants bear the burden of demonstrating that they complied with their fiduciary obligations under Ohio law.  *Radol v. Thomas*, 772 F.2d 244, 257 (6th Cir. 1985) (if

---

[18] Ohio courts have departed from Delaware law by declining to impose a duty on directors to obtain the highest price possible for the company's shares.  *See, e.g., Stepak*, 553 N.E.2d at 1078 ("[D]irectors are not held to a duty to the shareholders to obtain, like an auctioneer, the highest price possible for their shares of the corporation.").  Ohio statutorily limits the definition of "fair cash value" in a public company merger to "the closing sale price on the national securities exchange" immediately before: (i) the merger is approved; (ii) the merger becomes effective; (iii) an amendment to the articles of incorporation is filed; or (iv) the vote on the merger occurs. Ohio Rev. Code §§ 1701.85(c)(1) and (2).

plaintiff makes "a *prima facie* case showing that the directors have acted in bad faith or without requisite objectivity," then the burden is on the directors "of showing that a transaction is fair and in the best interests of shareholders").

### E. Exchange Act Claims

Finally, Defendants claim that the Section 14(a) allegations are not adequately pled with particularity and do not plead loss causation and that the Section 20(a) claims fail because they are dependent on the Section 14(a) allegations. (Counts I, II, III, IV).

#### 1. Section 14(a)

Section 14(a) establishes liability for material misstatements or omissions in a proxy statement. 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). When the proxy statement at issue is a proxy seeking shareholder approval of a corporate merger, the touchstone of a Section 14(a) violation based on omissions is materiality – something "that a reasonable shareholder would consider important in deciding how to vote." *TSC Indus. v. Northway, Inc*., 426 U.S. 438, 449 (1978). "This standard…does not require proof…that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *Id.* Rather, it contemplates a showing that the omitted fact would have assumed "actual significance in the deliberation of the reasonable shareholder." *Id.* This Court will not engage in a fact-intensive test at the pleadings stage. *Smith*, 2012 U.S. Dist. LEXIS 164868 at 10. *See also, Brown v. Brewer*, No. CV06-3731, 2008 U.S. Dist. LEXIS 108904, at *16-17 (C.D. Cal. July 14, 2008) (even if individual allegations

present a "close call," a motion to dismiss should be denied unless the court concludes "that such omissions are immaterial as a matter of law.").

The PSLRA requires heightened, particularized pleadings of facts to support a 14(a) claim: "Under the PSLRA, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Louisiana Mun. Police Employees Ret. Sys. v. Cooper Indus. PLC*, 12CV1750, 2012 U.S. Dist. LEXIS 148542, at *14-15 (N.D. Ohio Oct. 16, 2012) quoting 15 U.S.C. § 78u-4(b)(1).[19]

Defendants argue that the Section 14(a) claims must be dismissed because Plaintiff has failed to identify with particularity either: (1) any statement in the Proxy rendered false or misleading by a material omission; or (2) any specific omission or misrepresentation which caused Plaintiff actual economic harm.

### a. Economic loss, transaction causation, and loss causation

In Section 14(a) claims, "[l]oss causation refers to the cause of particular economic harm, while transaction causation refers to whether 'the misrepresentations induced plaintiffs to engage in the subject transaction.'" *Lane v. Page*, 649 F. Supp. 2d

---

[19] *See also* Doc. 32 at 5 ("In addition to pleading particularized facts showing that each alleged omission is material, a Section 14(a) plaintiff must also plead particularized facts showing that the omitted fact rendered an affirmative statement in the proxy false or misleading.").

1256, 1275 ("*Lane I*") (D.N.M. 2009).[20]  As the court in *Lane II* clarified: "There are four

basic elements of a claim under Section 14(a)…(i) the proxy statement contains a

material misrepresentation or omission; (ii) the defendants were at least negligent;

(iii) the misrepresentations or omissions caused the loss of which the plaintiff complains;

and (iv) the proxy statement was an essential link in the completion of the transaction at

issue."  *Lane v. Page*, 727 F. Supp. 2d 1214, 1227-1228 ("*Lane II*") (D.N.M. 2010).

Here, Plaintiff alleged that, if Defendants had not omitted or misrepresented

material information in the Proxy concerning the Company and its current and future

financial prospects, R&M shareholders would likely not have voted to approve the sale of

the Company and forego their right to share in the profits of a Company worth more

value than reflected in the Merger price.  (Doc. 53 at ¶ 8 ("As a result of the false and

misleading Proxy, the Company's former shareholders were precluded from casting a

fully informed vote in connection with the Merger and many agreed to give up their

equity interests in the Company in exchange for the inadequate Merger consideration.");

*Id.* at 65 ("On the other hand, the Merger did not adequately compensate the Company's

former shareholders for their investments in the Company.  The Merger price

significantly undervalued R&M."); *Id.* at ¶ 109 ("Citi's fairness analyses was faulty and

misled the Board as to the value of the Company's shares in comparison to the Merger

---

[20]  *See also Grace v. Robenstock*, 228 F.3d 40, 46-47 (2d Cir. 2000) ("both loss causation – that the misrepresentations or omissions caused the economic harm, and transaction causation – that the violations in question caused the plaintiff to engage in the transaction in question…must be proven in the context of a private action under Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.").

Consideration."); *Id.* at ¶¶ 130, 137 ("The Proxy was an essential link in causing plaintiff and the Company's shareholders to approve the Merger.").  As this Court previously found, appraisal is not the exclusive remedy for a post-transaction breach of fiduciary claim where "genuine fraud and breach of fiduciary claims [are] asserted."  *Maschari*, 553 N.E.2d at 1358. [21]

Additionally, Plaintiff has not yet been afforded an opportunity to obtain necessary damage discovery, including discovery and expert reports to establish a specific damages number.  While Defendants claim there is no loss because there are no legally compensable damages under Ohio law for failing to maximize the share price in a merger transaction, as discussed *supra* at Section III.B, Plaintiff has alleged more than inadequate share price.  Accordingly, Plaintiff has sufficiently alleged transaction causation, loss causation, and damages.

### b.  Material misrepresentation or omission

"[A] plaintiff must [also] allege that a proxy statement contains a material misrepresentation or omission that renders the proxy materials misleading."  *Strategic Turnaround Equity Partners v. Fife*, No. 10-cv-11305, 2010 U.S. Dist. LEXIS 63629, at

---

[21] The cases cited by Defendant are distinguishable from this case.  See, e.g., *Little Gem Life Scis. LLC v. Orphan Med., Inc.*, No. 06-1377, 2007 U.S. Dist. LEXIS 10939, at *21 (D. Minn. Feb. 16, 2007) (dismissing Section 14(a) claim where complaint "fail[ed] to clearly specify 'what the relevant economic loss might be or…what the causal connection might be' between the loss and the omission" because the issues were not material); *Krieger v. Atheros Communs.*, No. 11-cv-640, 2012 U.S. Dist. LEXIS 74214, at *19-20 (N.D. Cal. May 2, 2012) (dismissing Section 14(a) claim where complaint did "not connect any misstatements or omissions with an actual economic harm" and where "other factors [in the market] and the timing of the merger, rather than any misstatement or omission in the proxy statement, caused any alleged loss").

*13 (E.D. Mich. June 28, 2010). "In the context of a proxy statement, a fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, 5:11cv222, 2012 U.S. Dist. LEXIS 36784, at *27 (D. Vt. Mar. 19, 2012).[22]

Omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 only "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false of misleading." *Local 295/Local 851 IBT Emplr. Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 716 (S.D. Ohio 2010). The materiality of any such misleading omission can be assessed only after Plaintiff meets his burden of establishing a misleading omission in the first place.[23]

---

[22] Contrary to Defendants' assertion, *Huntington Bancshares Secs. Litig.*, 674 F.Supp.2d 951, 966-67 (S.D. Ohio 2009), does not require Plaintiff to "show" that any particular statement "actually [was] misleading." Whether or not Defendants statements in the Proxy are "actually" misleading are questions of disputed fact.

[23] A determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him and these assessments are peculiarly ones for the trier of fact.'" *Smith*, 2012 U.S. Dist. LEXIS 164868 at 10. "[T]o the extent the materiality question is close, the general rule for securities fraud cases is that at [the motion to dismiss] stage in the proceedings, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 499 (6th Cir. 2004). *See also Feiner v. SS&C Technologies*, 11 F.Supp.2d 204, 208 (D. Conn. 1998) ("if plaintiffs have alleged a single misstatement that can not be deemed immaterial as a matter of law, the action survives [the] motions to dismiss").

### i.    Strategic Alternatives

First, Plaintiff claims that Defendants failed to disclose: (1) the extent to which the Board was aware of and disregarded the UBS presentation; and (2) that the Board deliberately disregarded its duty to analyze the value of the strategic alternatives in comparison to the $60 Merger consideration.  (Doc. 53 at 82).  Plaintiff maintains that the omission of this information was material because it: (1) demonstrated that the Company could pursue strategic alternatives that promised greater long-term value for the Company's shareholders than the $60 per share Merger consideration (*Id*. at ¶ 83); (2) without this information shareholders did not know what they were giving up when they voted to accept the $60 Merger price (*Id.*); and (3) this information was necessary to assess whether the Board was fully informed about the fairness of the Merger consideration so shareholders did not know whether the Board's recommendation that the shareholders accept the $60 price was suspect (*Id*.)  Plaintiff further alleges that the omission of this information also made false and misleading the statements in the Proxy regarding the Board's January 5, 2012 meeting.  (*Id*. at ¶ 84).  Specifically, that the Board "considered 'the limited advantageous strategic alternatives available to use if we proceeded on a standalone basis;" and "creates the misleading impression that the Board made a fully informed decision that the Merger is a better deal for the Company's shareholders than other strategic alternatives and that the Board carefully considered stand-alone alternatives, including the value of these strategic alternatives in comparison with the Merger."  (*Id*.)

29

Defendants argue that where a proxy discloses that a board considered strategic alternatives but recommended the transaction, the "why" and detail underlying that other strategic alternative is not material. *Washtenaw County Emples. Ret. Sys. v. Wells Real Estate Inc. Trust, Inc.*, 1:07cv862, 2008 U.S. Dist. LEXIS 53652, at *26-27 (N.D. Ga. Mar. 31, 2008) (dismissing 14(a) claim alleging that "the Proxy failed to provide meaningful information, evaluation, or discussion concerning strategic alternatives considered…in approving and recommending" the transaction because "the plaintiff is merely arguing that more detail should have been given about the viability of the alternatives"). However, in *Washtenaw*, the court notes that the Proxy did in fact provide meaningful information, evaluation, and discussion concerning strategic alternatives considered – specifically that the Proxy disclosed all material information on the consideration of alternatives for the Company. *Id.* at 26-27. Here, Plaintiff expressly alleges that eh Proxy omitted such information.

### ii. Disclosure of why others did not bid

Next, Plaintiff maintains that the Company's management and Citi ignored instructions from the Board on how to handle discussions with potential buyers. (Doc. 53 at ¶ 46). At least one potential buyer informed the management that it would like to discuss a transaction at a later time. (*Id.* at ¶ 47). However, because of management's urgency to sell, NOVI was left as the only potential buyer, and thus in a position to secure a bargain basement price for the Company. (*Id.* at ¶ 48). Management, for their sale efforts, received payouts in the millions of dollars. (*Id.* at ¶¶ 62-64). In this context,

Plaintiff maintains that Defendants failed to disclose: (i) the bases provided by the potential parties for declining to pursue an acquisition of the Company; and (ii) the Board's involvement in and/or awareness of Citi's communications with buyers. (*Id.* at ¶ 86). Plaintiff argues that without this material information shareholders did not know what opportunities for a higher priced deal from a competing bidder they were giving up when they voted to sell the Company to NOVI for $60 per share. (*Id.* at ¶ 87). Moreover, shareholders were unable to assess whether the Board was adequately informed when making decisions (including agreements to deal protection devices). (*Id.*) Plaintiff claims that the omission of this information regarding the potential alternate bidders and the Board's determination that the Merger was in the "best interests" of the shareholders, created the misleading impression that the Board engaged a full and fair sales process. (*Id.* at ¶¶ 88-89).

The Board has no obligation under Ohio law to secure "the best price possible." *Stepak*, 553 N.E.2d at 1079-1080. Additionally, information regarding why a potential merger candidate declined to go forward is generally not material. *Louisiana Mun. Police Employees Ret. Sys.*, 2012 U.S. Dist. LEXIS 148542 at 30-31 (dismissing a 14(a) claim demanding information regarding the process leading up to the transaction, including efforts to market the entity).[24] *See also Henkel*, 962 N.E.2d at 402, 406-407 (dismissing claims based on omission of information regarding discussions with other

---

[24] In *Louisiana*, the court granted defendants' motion to dismiss not on an analysis or finding of immateriality, but on plaintiff's failure to point to "a statement that is misleading, or is made misleading by operation of a material omission." *Id.*

companies and why discussions were abandoned).  However, the fact that Defendants allegedly omitted this information in an effort to secure a large monetary payout in breach of their duty of loyalty, renders such omissions material.

### iii.    DCF line item disclosures

Before receiving NOVI's offer, Citi was allegedly using a lower WACC for R&M in its analysis.[25]  (Doc. 53 at ¶ 51).  UBS also used a lower WACC from R&M in its analysis.  (*Id*.)  After receiving NOVI's offer, Citi allegedly utilized a grossly inflated WACC of 11% to 13% in its DCF analysis.  (*Id*.)  Had Citi utilized a reasonable WACC (e.g., the 9-11% WACC utilized by UBS), its DCF analysis would have resulted in a significantly higher valuation of R&M, resulting in the larger consideration falling outside and below the range of fairness.  (*Id*.)

Accordingly, Plaintiff maintains that the Proxy failed to disclose: (i) the inputs and assumptions used to derive the discount rate Citi employed in its analysis; (ii) the previous lower WACC used by Citi and UBS, the basis for disregarding these numbers, and the implied per share equity value range for R&M if Citi had used these numbers in its analysis; (iii) the implied terminal EBITDA multiples observed by Citi in the analysis; (iv) the implied pershare equity value range for R&M if Citi had not used unreasonably low implied terminal EBITDA multiples in the analysis; and (v) how stock-based compensation was treated in Citi's DCF analysis.  (*Id.* at ¶¶ 91-93).  These metrics were

---

[25]  In a DCF analysis, WACC (weighted average cost of capital) is an assessment of what it costs for a company to access financing; a high WACC simply means it is expensive for the company to access that financing.  (Doc. 53 at ¶ 50).  Consequently, utilizing a higher WACC in a DCF analysis will yield a lower valuation of a company.  (*Id*.)

material to the shareholders' ability to observe the flaws in Citi's DCF analysis and to

assess the reliability of the DCF analysis as a measure of the Company's intrinsic value.

(*Id*. at ¶¶ 91-94).  Plaintiff maintains that these omissions collectively rendered Citi's

statements that the analysis indicated an implied per share equity range of $51.58 to

$68.16, and that the Merger consideration was "fair," misleading.  (*Id*.)  Furthermore,

without the omitted information, the Company's shareholders were unable to make any

meaningful determination whether that range reflected the Company's value or was the

result of Citi's unreasonable judgment, and were unable to reject Citi's opinion that the

Merger Consideration was fair to the Company's shareholders.  (*Id.* at ¶ 94).

Courts have dismissed shareholder claims seeking assumptions and components of

a financial advisor's cash flow analysis; all that is required in a proxy statement is a fair

summary.  *Dias v. Purches*, No. 7199-VCG, 2012 Del. Ch. LEXIS 227, at *32 (Del. Ch.

Oct. 1, 2012) ("the criteria used to select the ranges, multiples, or transactions that the

financial advisors use in their analyses are not material").  *See also In re Plains*

*Exploration & Prod. Co. S'holder Litig.*, No. 8090-VCN, 2013 Del. Ch. LEXIS 118, at

*34 (Del. Ch. May 9, 2013) ("There are limitless opportunities for disagreement on the

appropriate valuation methodologies to employ, as well as the appropriate inputs to

deploy within those methodologies.").  However, *In re Plains Exploration*, for example,

did in fact disclose how it determined the discount rates used in its DCF, and thus the

court held that stockholders "do not need an explanation why different rates were used in

different computations" because "stockholders can judge for themselves whether the discount rate was appropriate." *Id.* at 33.

There is no evidence of a similar explanation in the instant case.  In fact, Plaintiff maintains that the Proxy actually provided misleading information.  Accordingly, the Court finds that such omissions are material.

### iv.    Citi's M&A Transactions Analysis

Next, Plaintiff maintains that in performing the Transactions Analysis, Citi first selected a huge list of "comparable" transactions going back to January 1, 2000.  (Doc. 53 at ¶ 53).  In so doing, Citi was able to start off with a wide range of multiples as reflected in those transactions, going as low at 5.8x up to 17.2x.  (*Id.*)  Citi then looked at the multiples of the transactions in "such period deemed by Citi to be most comparable" to the Merger, 7.9x to 14.7x.  (*Id.*)  Citi then selected a range of multiples of 7.0x to 12.0x and applied those multiples to R&M's financials to calculate the implied range of R&M's firm value.  (*Id.* at ¶ 54).  By selecting these low multiples, Citi's Selected M&A Transactions Analysis yielded a significantly lower valuation.  (*Id.*)  Plaintiff claims that had Citi utilized reasonable multiples (*e.g.*, based on the transactions Citi deemed most comparable), its Transactions Analysis would have resulted in a significantly higher valuation of R&M, resulting in the Merger consideration falling outside and below the range of fairness.  (*Id.*)  In this context, Plaintiff maintains that the Proxy failed to disclose: (i) the individually observed multiples for each of the selected transactions; (ii) what transaction period Citi deemed most "comparable," or which transactions were

included in that period; (iii) the implied per share equity value range for R&M if Citi had

not used unreasonably low LTM EBITDA multiples in this analysis. (*Id.* at ¶¶ 96, 98).

These metrics were material to the shareholders' ability to observe the flaws in Citi's

Selected M&A Transactions analysis and to assess the reliability of the Selected M&A

Transactions analysis as supporting the fairness of the Merger consideration. (*Id.* at

¶¶ 96, 98, 100). Plaintiff maintains that these omissions collectively rendered Citi's

statements that the analysis indicated an implied per share equity range of $45.31 to

$75.58 and that the Merger consideration was "fair," misleading. (*Id.* at ¶¶ 97, 99).

Without the omitted information, the Company's shareholders were unable to make any

meaningful determination whether that range reflected the Company's value. (*Id.* at ¶

100).

Defendants maintain, however, that shareholders are not entitled to "the data

necessary to replicate [the financial advisor's] analysis." *Gottlieb v. Willis,* No. 12-cv-

2637, 2012 U.S. Dist. LEXIS 159343, at *16-17 (D. Minn. Nov. 7, 2012). *Gottlieb*

observed that Delaware courts have recognized the importance of financial information

(like projections) in cash-out merger situations in which shareholders were confronted

with a one-time, immediate decision whether to accept cash for their shares and

extinguish their interests in a company. *Id.* at 14 ("[w]hen stockholders must vote on a

transaction in which they would receive cash for their shares, information regarding the

financial attractiveness of the deal is of particular importance."). The court then

emphasized that the subject case was not a cash-out-merger case. *Id.* at 14-15 ("This,

35

however, is not a cash-out-merger case. Instead, Navarre shareholders are being asked to judge the desirability of acquiring SpeedFC in the context of Navarre's continued operation as a going concern. Although projections of Navarre's and SpeedFC's future performance might nevertheless be helpful, they remain individual pieces of an overall financial picture."). Because the transaction was not a cash-out merger, the *Gottlieb* court determined that plaintiff was improperly seeking financial data merely to replicate the banker's analysis. *Id.* at 17.

Here, the omitted financial information was necessary not merely to check or replicate Citi's analysis. This information was necessary for the Company's shareholders to make an informed decision in a situation where: (i) shareholders were being advised by the Board to accept $60.00 per share in cash and give up their equity interests in the Company; (ii) the Board provided Citi's analysis and conclusion to the Company's shareholders in support of their recommendation; and (iii) Citi's analysis was flawed and shareholders needed the information to observe the flaws. None of the cases cited by Defendants hold that critical financial omissions, like that one's allegedly present here, need not be disclosed. Accordingly, Defendants cannot show that the financial information omitted here is immaterial as a matter of law.

Here, Plaintiff was entitled to a fair summary of the Transactions Analysis and omission of the same was material.

### v.     Selected public companies

Next, Plaintiff argues that had Citi appropriately reflected a control premium in its analysis, as was customary, its Selected Public Companies Analysis would have resulted in a significantly higher valuation of R&M, resulting in the Merger consideration falling outside and below the range of fairness.  (Doc. 53 at ¶ 55).  Plaintiff claims the Proxy failed to disclose: (i) the individually observed multiples of each of the selected companies and the resulting value indications from application of each of the separate multiple ranges; and (ii) that Citi disregarded control premium in this analysis and Citi's basis for disregarding control premium in this analysis.  (*Id.* at ¶¶102-103).  These metrics were material to the shareholders' ability to observe the flaws in Citi's Selected Public Companies Analysis and to assess the reliability of the analysis as supporting the fairness of the Merger consideration.  (*Id.*)  Plaintiff claims that without the omitted information, the Company's shareholders were unable to make a meaningful determination whether that range reflects the Company's value.  (*Id.* at ¶ 104).

For the reasons explained *supra* at Section III.E.b.iv, the Court finds such omissions to be material.

### vi.     Financial projections

Plaintiff also alleges that Defendants omitted certain financial projections provided to NOVI and Citi, including: (i) depreciation and amoritization; (ii) stock-based compensation expense; (iii) EBIT; (iv) capital expenditures; and (v) changes in working capital.  (Doc. 53 at ¶¶ 105-106).  These projections were used by Citi in its fairness

analyses, including in its DCF analysis.  (*Id.*)  Plaintiff claims that the omission of this information renders the Proxy materially misleading because these critical line items significantly impact the calculation and significance of the free cash flow numbers.  (*Id.* at ¶ 107).  Without this information shareholders were not informed of management's best estimates of the Company's future cash flows, even when those projections formed the basis for the fairness opinion offered by the Board's financial advisor.  *In re PNB Holdign Co. S'holders Litig.*, No. 28-N, 2006 Del. CH. LEXIS 158, at *58 (Del. Ch. Aug. 18, 2006) ("In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate.  After all, the key issue for the stockholders is whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company.").

Plaintiff argues that the omitted projections rendered the partially disclosed projections (the "revenue," "EBITDA," and "Unlevered, After-Tax Free Cash Flow" numbers for 2013-2017) materially incomplete.  (Doc. 53 at ¶ 107).  *See Brown v. Brewer*, No. CV 06-3731-GHK, 2010 U.S. Dist. LEXIS 60863, at *69-70 (C.D. Cal. June 17, 2010) ("A company has no duty to include speculative financial predictions in a proxy.  However, if a Proxy discloses valuation information, it must be complete and accurate.  Both the proxy and the [financial valuation] opinion address the value of the [property] and so [the defendant] has a duty to fully and accurately disclose information related to the valuation.").  Moreover, the omitted projections rendered the statements

regarding Citi's DCF analysis misleading.  (Doc. 53 at ¶ 108).  Plaintiff maintains that

without the omitted projections, those statements created the misleading impression that

Citi's DCF analysis was reliable and supported the fairness of the Merger Consideration.

Courts generally hold that financial projections, in the absence of evidence of

reliability, are not required disclosures that would be material to shareholders.  *Gottlieb*,

2012 U.S. Dist. 159343 at 15-16.  While the Proxy warns that the internal forecasts

disclosed to NOV and Citi were "not prepared with a view toward public disclosure," not

"prepared in compliance with regularity guidelines or accounting principles," and not

"included to influence your decision whether to vote for the merger" (Doc. 60, Ex. A at

46), if a Proxy discloses valuation information, it must be complete and accurate.  *Brown*,

2010 U.S. Dist. LEXIS 60863 at 69-70.

Accordingly, to the extent Plaintiff claims the projections were misleading and

inaccurate because critical information was omitted, such omissions are material.

### vii.    Conflicts of interest

Finally, Plaintiff maintains that Wallace and the Company's management initiated

the sales process, handpicked the financial advisor, coached the financial advisor to act

against the instructions of the Board, hid material information from the Board regarding

valuable strategic alternatives, and secured millions of dollars as a result of the Merger.

(Doc. 53 at ¶¶ 38-48, 62-64).  Plaintiff claims that Defendants failed to disclosure: (i) that

management received a presentation from UBS; (ii) that UBS provided a valuation

analysis of four different strategic alternatives compared to Citi who focused on an

acquisition of or by the Company; (iii) the pre-existing relationships between R&M management and the members of Citi's team; (iv) the extent of the Board's consideration and/or awareness of both Citi's and UBS's presentations; (v) the Board's involvement in and/or awareness of the negotiation and timing of Citi's engagement; and (vi) the Board's consideration and/or awareness of the purpose for which Citi was hired. (*Id*. at ¶ 77). Plaintiff maintains that omission of this information was material because without it shareholders were unable to assess the conflicts of interest that tainted the sales process, including Citi's conflict of interest when it conducted its fairness analyses. (*Id*. at ¶ 78).

The Court finds that the omission of this information is most compelling and, without doubt, material to the shareholders vote.

### 2. Section 20(a)

"To establish liability under §20(a), plaintiffs must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant, and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *In Re Telxon Corp. Sec. Litig*., 133 F. Supp.2d 1010, 1032 (N.D. Ohio 2000).

Defendants maintain simply that Plaintiff's wholly conclusory allegations that NOVI and Merger Sub exercised control over R&M is insufficient to support a Section 20(a) claim. However, Plaintiff has alleged that the individual Defendants, R&M, and NOVI, exercised control over R&M and that the Defendants had the power and ability to control (and did influence and control) the transactions at issue as well as the information in the Proxy. (Doc. 53 at ¶¶ 95-101).

## IV.  CONCLUSION

Accordingly, for the reasons stated here, Defendants' joint motion to dismiss

(Doc. 60) is **DENIED**.

**IT IS SO ORDERED**.

Date:  8/27/13                                        *s/ Timothy S. Black*
                                                     Timothy S. Black
                                                     United States District Judge